ALBANY,
Feb. 1808.

M'Menomy &
Townsend
v.
Ferrers.

## M'Menomy and Townsend, assignees of Mark and Speyer, bankrupts, *against* Ferrers.

THIS was an action of *assumpsit*, for money had and received to the use of the plaintiffs. Plea, *non-assumpsit*. The cause was tried, the 4th *April*, 1806, before Mr. Jus- veyance of certain lands, which, by a declaration in writing, executed by them, on the 31st *May*, 1800, they declared to be in trust, to pay particular creditors, in preference. On the 13th *June*, 1800, they drew an order on one F, their agent, directing him to pay to R, such monies as should come to his hands, from certain persons in *Europe*, from whom F had been authorised to receive the amount of certain policies of insurance, which order was accepted by F, on the same day, to pay the monies as soon as they came into his hands. On the 11th *July*, 1800, M & S committed an act of bankruptcy, and on the 18th *July*, 1800, were duly declared bankrupts, under the law of the *United States*, which took effect on the 1st *June*, 1800. In an action brought by the assigness of M & S, against F, it was held, that the order and acceptance amounted to an assignment, and fixed the fund irrevocably, and that the order was not given in contemplation of bankruptcy, so as to make it fraudulent under the bankrupt law.

M & S being
in embarrassed
circumstances,
on the 15th
*April*, 1800, executed a con-

tice *Tompkins*, at the circuit, in *King's* county.   *J. Mark*
and *J. Speyer*, having been partners together, under the
firm of *Jacob Mark, & Co.* dissolved their copartnership,
in the month of *August*, 1799.   On the 18th *July*, 1800,
*Mark & Speyer* were duly declared bankrupts, having
committed an act of bankruptcy on the 11th *July*, 1800.
The plaintiffs were appointed assignees, and an assign-
ment was made to them by the bankrupts, in *September*
following.  Previous to the bankruptcy of *Mark & Speyer*,
they appointed the defendant their agent, in relation to a
certain claim which they had against persons in *Europe*,
arising out of certain policies of insurance, and the
defendant, as agent of *Mark & Speyer*, subsequent
to their bankruptcy, received from *Europe*, on ac-
count of such claim, the sum of 733 dollars.   *M. & S.*
being indebted to one *I. Roosevelt*, in a sum of money,
exceeding the amount in controversy in this cause, on the
13th *June*, 1800, drew an order on the defendant, in fa-
vour of *Roosevelt*, and which was, on the same day ac-
cepted by the defendant.   The order was as follows :

" Sir—You will please to pay to *James Roosevelt*, or to
" his order, such monies as shall come to your hands, due
" to *Jacob Mark & Co.* on account of policies of insur-
" ance, signed by the said *Jacob Mark & Co.* whereof a
" recovery shall be had on those policies; and the said
" *James Roosevelt*, is hereby authorised and empowered
" to give discharges for the same, and convert the amount
" to his use, for value received.   *New-York*, 13*th June*,
" 1800."  Signed " *Jacob Mark*, for *Jacob Mark & Co.* ad-
" dressed to Mr. *John Ferrers*."   The acceptance by the
defendant, was in the following words :  " *New-York*, 13th
" *June*, 1800, Accepted, to account as above, for such
" monies as may come to my hands, in consequence of
" my agency, for Messrs. *Jacob Mark & Co.* in the cases
" above stated."   Signed " *John Ferrers*."

It appeared, that in the autumn of the year 1799, the
affairs of *M. & S.* were considerably embarrassed.   On
the 2d *December*, 1799, they executed a deed to *John
Murray*, of the city of *New-York*, for 64,000 acres of

land, lying in the county of *Clinton*, in trust, for certain of their *German* creditors, and upon certain terms specified in the deed. One of the terms was, that if the said creditors did not consent to release *Speyer*, or give notice of their acceptance of the land, at 2 dollars per acre, by the 1st day of *January*, 1801, then the property was to be applied to other purposes. In the month of *April*, 1800, *Speyer* conveyed to *Murray*, two lots of ground in the city of *New-York*, some canal, and other shares, in trust, for securing a debt due from *Speyer*, to his father; and for the same purpose he executed, on the 31st *May*, 1800, a bill of sale of all his furniture, to *Murray*, but which was afterwards returned to *Speyer*. On the 31st *May*, 1800, *Mark* executed a deed, or declaration of trust, to *Townsend*, one of the plaintiffs, and *S. Jones*, jun. reciting a conveyance, then lately made, (15th *April*, 1800,) by *Mark* to *Townsend* and *Jones*, of upwards of 60,000 acres of land, besides other property, in trust, to pay all debts due by *Mark & Speyer*, to the said *Roosevelt*, in the manner, and for the reasons, set forth in the declaration; which stated, by way of recital, that the said *Roosevelt*, at the request of *Mark*, and to befriend *Mark & Speyer*, and under a full belief of their solvency, had, at sundry times, lent them large sums of money, and had indorsed their notes, to the amount of 25,000 dollars, and upwards, the payment of which loans, and an indemnity against which said engagements, they, *Mark & Speyer*, had considered it their duty to secure to the said *Roosevelt*, as far as in their power, in preference to all other debts and demands against them; and that *M. & S.* had given to *Townsend* and *Jones* a judgment for 100,000 dollars, in trust, for *Roosevelt*, on which no execution was to be taken out against the body of *Mark*. The declaration further stated, that the conveyance was in trust to pay the debt to *Roosevelt*, before any other creditor; and that, in case the creditors of *M. & S.* would take an assignment of the property, for the payment of their

ALBANY,
Feb. 1808.

M'Menomy &
Townsend
v.
Ferrers.

debts, valuing the land at the rate therein specified, then the trustees might assign the same, on condition that all the demands of *Roosevelt* were first paid, or sufficient property retained, to be selected by them, to pay *Roosevelt*. The declaration further stated, that if it should happen at any time, while the premises remained in trust, that a commission of bankruptcy should be sued out against *Mark & Speyer*, or an assignment should be made, under the insolvent act of the state of *New-York*, and it should become necessary, in the opinion of the trustees, that, then, it should be lawful for them, to vest the property in the hands of the assignees under the bankrupt law, or the insolvent act, retaining enough, in their opinion, to satisfy *Roosevelt*, to be selected by them; the property so retained, not to be assigned, until *Roosevelt* was fully satisfied, or consented, or unless compelled by law, or unless counsel should advise that they might be compelled by law to assign, and not then, unless *Roosevelt* neglected for three days, to indemnify the trustees.

All the land, described in the last mentioned deed, except 22,000 acres, had been mortgaged, and a considerable part sold under the mortgage. No incumbrance appeared on the 22,000 acres. *Mark*, on his examination before the commissioners, stated the value of the land to be from 2 to 3 dollars per acre; but on a sale of part of them, under a decree of the court of chancery, it sold only for 77 cents per acre. *Speyer*, on his examination, stated, that *Mark* and his wife, in *March*, 1800, executed a mortgage for 6,000 dollars, for which sum, a judgment was also entered up to secure *Murray*, for the advances which he might make to *Mark & Speyer*, in case they should be obliged to go to prison, which they then contemplated, and to be relieved under the insolvent act of this state. It appeared further, that at the time *Speyer* assigned his household furniture to *Murray*, he also assigned a bond against one *Hommel*.

At the trial, *Mark* (who had obtained his certificate) testified, that he could not say what was the precise balance due to *Roosevelt*, but he believed it to be

upwards of 20,000 dollars, and that he had agreed to pay *Speyer* 10,000 dollars for his interest in the partnership, at the time of its dissolution, and to take the whole benefit and burthen upon himself; that the order given to *Roosevelt*, on the defendant, was not given in contemplation of bankruptcy, and that he had no expectation of becoming a bankrupt, a fortnight before the commission issued.

*Samuel Jones*, jun. who was sworn as a witness, on the trial, testified, that the above-mentioned deed to *Murray*, was executed, as he understood, in compliance with the engagements of *Mark & Speyer*, to give the creditors named therein, or the majority of them, land, as security for their debts; that most of the creditors had made loans to *Mark & Speyer*, on the credit of the lands specified in the deed, or other lands of *Mark & Speyer*, under certain agreements between them; that *Roosevelt* applied to the witness, to endeavour to obtain security from *Mark & Speyer*, for whom the witness was counsel, some time before the execution of the deed above-mentioned, to him and *Townsend*: the witness could not state with certainty how long before, but thought it as early as *March*, when he spoke to *Mark & Speyer* on the subject; that *Roosevelt* alleged, as the ground of this application, that he had been promised security at the time he lent his indorsements, and which *Mark* admitted; that *Roosevelt* was pressing for security, which *Mark* declined, saying it was unnecessary, and that he did not wish to incumber his lands, nor to put it in the power of *Roosevelt* to sacrifice them by forced sales; but was finally prevailed upon, though with some difficulty, to execute the deed above-mentioned, on condition that *Townsend* and the witness should be the trustees; that *Roosevelt* still complained that the security was not such as had been promised to him, and that he ought to have further security. The witness further stated, that he was acquainted with the affairs of *Mark & Speyer*, and did

ALBANY,
Feb. 1808.

M'Menomy &
Townsend
v.
Ferrers.

not believe, that they could get on, and such had been his conviction for a long time; he had thought that they must either become bankrupts, or seek relief under the insolvent act, but he did not know what course of conduct they meant to pursue; that *Mark* appeared to think that he should be able ultimately to pay his debts, and seemed at first, very sanguine in that opinion, and persevered in the belief, until very shortly before *Mark & Speyer* became bankrupts. The witness believed, though he did not certainly know, that *Mark & Speyer* had discontinued their regular course of business, from the time of the dissolution of their copartnership. That the deed and judgment, given as security to *Roosevelt*, on the 15th *April*, 1800, and the declaration above-mentioned, were all intended as one transaction, and were so agreed on, and directed to be made out by the parties, previous to the execution of the first deed, which did not express the trust, and that the delay in executing the declaration of trust, was owing to accident or a pressure of business, and not to any design.

The judge charged the jury, that actual insolvency, or a state of things which would induce a belief in others of the insolvency of a debtor, or a belief or expectation by a creditor of such insolvency, or contemplation of bankruptcy by his debtor, and of the intent of the creditor to acquire a preference by the security he obtains, did not furnish the criterion by which the present suit was to be determined; but the question for the jury to determine, was, whether the debtor, at the time he gave the order in question, contemplated bankruptcy, and intended to prefer a particular creditor? If so, the transaction would be void, as against the spirit of the bankrupt law; but, that if the debtor was coerced into the measure, by an apprehension of an arrest, on refusal, or could not avoid giving the security, or, if it was done in performance of an agreement made when no preference was contemplated, then, in either of those cases, the creditor was entitled to his security, though the debtor contemplated bankruptcy.

when the security was given. He, however, informed the jury, that, in his opinion, if they believed *Mark* contemplated bankruptcy, at the time the order was given, there was not evidence in the cause to induce a belief that the order was obtained by threats of legal coercion, or in performance of any antecedent agreement ; and that the order was valid, notwithstanding the intervening act of bankruptcy, if *Mark* did not contemplate bankruptcy when he gave it.

The jury found a verdict for the defendant.

A motion was made to set aside the verdict, and for a new trial, for the misdirection of the judge, and because the verdict was against evidence.

*Pendleton*, for the plaintiff. 1. The order created no specific *lien* on the fund. Its terms show it to be revocable. The defendant was a mere commercial agent, acting for his principal, and his agency was of a revocable nature. The order was liable to a contingency, and the agent had no authority to pay, until the money came into his hands. Such an authority would be at an end, by the intervening bankruptcy of the agent, or of the makers of the order, or by the death of the parties. An act of bankruptcy is a revocation of all authorities given by the bankrupt ;[*] and the 13th section of the bankrupt law of the *United States*,[†] declares the same principle. As the money, therefore, came into the hands of the defendant, after the bankruptcy of *Mark & Speyer*, he must be considered as receiving it to the use of their assignees. If after making this order, *Mark & Speyer* had made a regular assignment to a third person in *Europe*, of this fund, would not such an assignment have been valid ? *A fortiori* must an assignment under the bankrupt law prevail.[‡] No doubt, that if an order be drawn on the person holding the fund, it will attach and be a *lien ;* such are the cases of *Peyton* v. *Hallett*,[§] and *Yates* v. *Groves*,[¶] which will, probably, be cited on the other side. In the present case, the order is not on the person holding the fund, but on an agent, directing him to pay, when he should receive the money.

[*] *Smith* v. *Goddard*, 3 *Bos. & Pull.* 465.

[†] *Laws of the U. S.* v. 5. p. 55.

[‡] *Hovil* v. *Browning*, 1 *East*, 154.

[§] 1 *Caines*, 363.
[¶] 1 *Ves. jun.* 280

ALBANY,
Feb. 1808.

M'Menomy &
Townsend
v.
Ferrers.

* Alderson v.
Temple, 4
Burr. 2235.
Harman v.
Fisher, Cowp.
117.

It has been held that, if a person indorses a note to ano-ther, which is sent by post, and the next day, before the indorsee receives the note, he becomes a bankrupt, the indorsement is void.*  Again, no notice of the order was given to the debtors, or persons holding the fund in Eu-rope.  Might not *Mark & Speyer* have received the mo-ney themselves, without being liable to an action by *Roose-velt* ?  If so, their assignees may receive it.

2.  The order was intended as a *voluntary preference* to a particular creditor, and in contemplation of bankruptcy, and was, therefore, fraudulent.  There appears to have been no pressure, or legal diligence used against *Mark & Speyer*, by *Roosevelt.*  An indefinite promise of security could not be enforced, and created no legal obligation.  If made in contemplation of bankruptcy, such promise would be void.  Indeed, the facts in the case most irresistibly lead to the conclusion, that *Mark & Speyer* contemplated a bankruptcy, and that they were determined to give a preference to *Roosevelt.*  The original deed of the 15th *April,* 1800, contained no declaration of trust, and must, therefore, be considered as in trust for the grantor, and void as against creditors.  The subsequent declaration of trust of the 31st *May,* will not so attach on the original deed, as to make it valid, as one *bona fide* conveyance. But the deed of declaration itself, expressly states the inability of *Mark & Speyer* to pay their debts, and contains provisions in favour of a particular creditor, in case of bankruptcy.  Is it possible, then, to believe, that they did not contemplate bankruptcy when they made that convey-ance?  The subsequent explanations by *Mark,* cannot de-stroy the strong internal evidence, arising from the written documents.  Though the deed of the 31st *May,* 1800, was not of itself an act of bankruptcy, since the law of the *United States* did not take effect until the 1st *June ;* yet the act had been passed, and the deed was made with a view to defeat the operation of it, and must, therefore, be considered as made *in fraudem legis,* and void.†  This conveyance comprised all the property of *Mark & Speyer,*

† 1 *Johnson,*
374.  3 *Wilson,*
47.

except what had been given as security to particular creditors. A deed in trust to pay all creditors, except one, is void ;[*] but here was a deed in trust to pay one creditor, in exclusion of all the rest.

*P. W. Radcliff* and *Benson*, contra. 1. This order was not a mere authority to receive money, but a transfer of so much of the fund. The cases of *Row* v. *Dawson*,[†] and *Yeates* v. *Groves*[‡], are strong cases to show, that such an order amounts to an assignment. No particular form of words was necessary; as soon as the order was accepted, the property was fixed. But this point has been expressly decided, in an analogous case, that of *Peyton* v. *Hallett*,[§] in this court. The order could no more be revoked after it was delivered, than the assignor of a bond could revoke his assignment. If the persons in *Europe* who had the fund, should have paid it, before notice of the order, they could not, it is true, be again called upon for the money. But whether such notice was, in fact, given or not, will not vary the question before the court. *Mark & Speyer* transferred their right, and *Roosevelt* took upon himself the risk of notice. Again, after the order was shown to the defendant, he must be considered as the agent or trustee of *Roosevelt*, in relation to the money, and as no longer the agent of *Mark* or *Speyer*, or their assignees.

2. To make void an assignment or delivery of property by a debtor, it must be shown to have been done in contemplation of a certain and impending bankruptcy, not from the vague apprehension of a possible future bankruptcy. A conveyance by a trader of part of his property, carries with it no evidence of fraud; and if complete, before the act of bankruptcy, it will be valid, unless there be positive evidence of fraud.[¶] To the general rules on this subject, there are several exceptions : As if the conveyance or delivery be made to relieve the party from legal process, or from the bare threat or even groundless apprehension of it, the conveyance is valid.[**] And it is not even necessary, that a man should be actually arrested. It is enough, if the creditor

ALBANY, Feb. 1808.

M'Menomy & Townsend v. Ferrers.

[*] *Gayner's* case, 1 *Burr.* 477. *Cook's B. L.* 3d ed. 108.
[†] 1 *Vezey*, 381.
[‡] 1 *Vesey, jun.* 280.

[§] 1 *Caines*, 363. *Livingston*, J. 379.

[¶] *Cullen*, 44. 50.

[**] *Alderson* v. *Temple*, 4 *Burr.* 2239. *Thompson* v. *Freeman*, 1 *Term*, 155.

ALBANY,
Feb. 1808.

M'Mennomy &
Townsend
v.
Ferrers.

\* *Ex parte Scu-
damore,* 3 *Vesey,
jun.* 85. *Cul-
len's B. L.* 280,
281.
† *Harman* v.
*Fisher,* Cowp.
125.
‡ 6 *Term,* 153.

§ 2 *P. Wms.*
429.

comes with a pressing demand on the feelings and con-
science of the debtor, and urges him for security.\* So
if payment be made, or an act be done, in pursuance of a
prior agreement, or in the ordinary course of business, it will
be valid.† In the case of *Smith* v. *Payne,*‡ Lord *Kenyon*
recognized all these exceptions, and under the circumstan-
ces of the case, which were not very dissimilar to the
present, and because, the bankrupt himself had sworn to
the honesty of the transaction, and that he did not meditate
a bankruptcy, at the time, he refused to set aside the
verdict. In the present case, there was a prior engage-
ment to give *Roosevelt* security ; and *Mark* has sworn ex-
pressly, that it was not done in contemplation of bank-
ruptcy. *Roosevelt* was certainly a very meritorious cre-
ditor, and had peculiar claims on *Mark & Speyer*, for
security ; and, as was observed by the *Master of the Rolls*,
in the case of *Small* v. *Oudley,*§ there may be cases so
circumstanced, that a trader honestly may, nay, ought to
to give a preference.

There is nothing in the deed and declaration of trust,
if attentively examined, that indicates fraud, unless the
giving a preference to *Roosevelt* be a fraud. The provi-
sion, in case of bankruptcy, was solely for the purpose of
giving the trustees a direction, in relation to the execution
of their trust, in case such an event should happen. It
was the contemplation of a possible bankruptcy. But in
answer to these allegations of fraud, in relation to the
bankrupt law, it is sufficient to say, that all the transactions
complained of, were prior to the existence of that law ; for
though the act of the *United States*, on this subject, passed
the 4th *April*, it was to have no operation until the 1st
*June*, 1800. It may be said, then, to have had no legal
existence or power, until the 1st *June*, so that no fraud in
relation to it, could arise from acts done prior to that time.
Again, there has been a verdict in this cause for the de-
fendant, in the *common pleas ;* and after the removal of

the cause here, there has been another verdict in his favour, and whether fraud or not, being a question of *fact*, it is unprecedented to grant a new trial after a second verdict.

*Pendleton* objected, that no notice could be taken of what passed in the mayor's court, in relation to this cause ; and *Radcliff* offered an affidavit of the facts, as he had stated them.

SPENCER, J. The judges of this court must know, and will take notice of what passes on trials before them ; but we have no such knowledge in relation to trials before inferior courts, and to bring the facts before this court, by affidavit, is unprecedented.

KENT, Ch. J. We may, perhaps, take notice of the fact, in the exercise of our discretion, as to granting a new trial.

THOMPSON, J. Though it is unusual to receive affidavits in such a case, yet I see no objection to taking notice of the fact suggested, when we come to exercise our discretion as to the propriety of granting a new trial.

*T. A. Emmet*, in reply. 1. The rule laid down by Chief Justice *Lewis*, in the case of *Peyton* v. *Hallett*,* seems to me to be the correct one ; that the *lien* is confined to the case of an order on the person holding the fund, and has never been extended so far as to vest an interest in one man, in a fund which may, or may not, come into the hands of another. The acceptance of the order in the present case is conditional ; that is, " if I receive the money, and receive it as the agent of *Mark & Speyer*, I will pay it to you." No doubt, if the money had come into the hands of the defendant, prior to the bankruptcy of *Mark & Speyer*, they would have been bound by their order to pay it to *Roosevelt ;* but here the fund might have been attached in *Europe*, or *Mark & Speyer* might have displaced the defendant as their agent, before the money was paid to him.

2. It does not appear, from the case, that *Roosevelt* knew of the order or the acceptance. It appears, then, to be

* 1 *Caines*, 380

a transaction incomplete, or an arrangement made with a view to prefer *Roosevelt*. The law on this subject is well summed up by *Wood*, *arguendo*, in the case of *Rust* v. *Cooper*.* " Though in general, a trader, before an act of bankruptcy committed, has such a property in, and power over, his effects, as to do acts which, by consequence, may give one creditor a preference to another ; yet, if he is *insolvent*, or has an act of bankruptcy *in contemplation*, he can do no act *out of the usual course of trade*, in favour of a particular creditor." The length of time intervening makes no difference, if a bankruptcy is contemplated. In the case of *The Assignees of Cummings* v. *Jackson*,† the court considered the stopping payment and insolvency, as controuling circumstances, to show a meditated bankruptcy. It is not pretended, that here was any *fraud*, in a *moral sense*, but a legal, or constructive fraud. What circumstances amount to a fraud is a question of *law*.‡ There are strong and sufficient circumstances in the present case, to justify the court in making the inference of fraud. The acknowledged *insolvency* of the debtors, the *preference* of a particular creditor, and the transaction being out of the ordinary course of business, with the very suspicious character of the conveyance to *Townsend & Jones*, most conclusively show that species of fraud, which must render this act of *Mark & Speyer* void, and that the plaintiffs are, therefore, entitled to the money in the hands of the defendant.

* *Cowper*, 630.

† 1 *Johnson*, 370.

‡ 1 *Burrow*, 396.

VAN NESS, J. delivered the opinion of the court.    A new trial is moved for in this cause ;

1st. Because, the order drawn by *Mark*, in behalf of himself and partner, upon the defendant, was contingent and revocable, and that it was, in fact, revoked by the intervening bankruptcy of the drawers :

2d. Because the order was given in contemplation of bankruptcy, and for the purpose of giving *Roosevelt* an undue preference, and so a fraud upon the bankrupt law.

ALBANY,
Feb 1808.

M'Menomy &
Townsend
v.
Ferrers.

* 1 *Caines,* 363.

I consider the first question as settled by the decision of this court, in the case of *Peyton* v. *Hallet.** The order, in that case, was drawn upon an agent, not in possession of the fund out of which it was to be satisfied ; and the objection arising from that circumstance, was much relied upon, and seems to have been well considered. The court held, that the order and acceptance fixed the fund irrevocably, and amounted to an equitable assignment of it. The effect *Peyton's* bankruptcy might have had on the order, was also noticed, and the court supposed that *White* (the witness) would not have been deprived, thereby, of his *lien.* Indeed, upon no other principle, could *White* have been considered as an incompetent witness. This decision is not only well founded in principle, but is supported by authority. (*Powel* v. *Gordon,* 2 *Esp. Rep.* 735. *Green* v. *Scott,* 1 *Ves. jun.* 282. *Row* v. *Dawson,* 1 *Vez.* 331.) I am satisfied that there is no ground for the distinction that was attempted to be shown between this case, and those which have been mentioned. It was strongly urged, on the argument, that, in the case of *Green* v. *Scott,* and *Row* v. *Dawson,* the funds were actually in the hands of the drawees. This is not so. In the last of these cases, the very terms of the order will show, that part of the bond was not in hand. Nothing, even at law, vests in the assignee of a bankrupt, but such real and personal estate, of which the bankrupt had the *equitable,* as well as *legal* interest. (*Willes' Rep.* 402.) In the case of *Carpenter and others* v. *Mainell,* (3 *Bos. & Pull.* 40.) it was held, that where a bankrupt, before his bankruptcy, had indorsed a note, payable out of a contingent and specified fund, although the indorsement had no legal effect, yet it passed the beneficial interest, and the bankrupt became a mere trustee for the indorsee, and that the trust did not pass to his assignees, under the assignment.

The moment the money, in this case, came into the hands of the defendant, he became bound to pay it over to *Roosevelt.* Certainly, *Mark & Speyer* could not reclaim

it; and unless the order was fraudulent, their assignees succeeded to no greater or better rights. This appears to me to be a case, that must frequently have occurred in the course of commercial transactions, and great and extensive mischief and inconvenience would result from the doctrine, contended for by the counsel for the plaintiffs, if it should have been found necessary to accede to it.

The remaining question, if the bankrupt system was still in operation, might present some difficulty. The bankrupt law was passed on the 4th *April*, 1800; but was not to take effect, until the 1st of *June*, 1800. *Mark & Speyer* were declared bankrupts, on the 18th of *July*, upon an act of bankruptcy committed on the 11th of *July*, in the same year. The deed to *Jones & Townsend*, is dated the 15th of *April*, and the declaration of trust, the 31st of *May*, 1800, both anterior to the period when the bankrupt law went into operation. The order on the defendant, is dated the 13th of *June*, nearly a month before the act of bankruptcy was committed.

It is not contended, that the conveyances, and other dispositions, which *Mark & Speyer* made of their property, prior to the 1st of *June*, of themselves, amounted to an act of bankruptcy. The bankrupt law never attached upon them, unless by construction, until after they were completed. But it is said they were fraudulent, because designed to defeat or evade the operation of an act which they knew would, in a short period, put it out of their power to give a preference to favoured, or, what they conceived to be, meritorious creditors. Before the bankrupt law, debtors had a right to give a preference to *bona fide* creditors. There is nothing in our insolvent laws to prohibit it; and the bankrupt law left this right until the 1st of *June*, 1800, unimpaired. In *England*, before the passing of the bankrupt laws, debtors had the same right; whenever, therefore, we find it said in the books, that an attempt to give a preference to a particular creditor, on the eve of bankruptcy, is fraudulent, it is to be un-

derstood, that such attempt is fraudulent, as against the spirit of the bankrupt laws only. If the deeds to *Murray*, and to *Jones & Townsend*, were executed by *Mark & Speyer*, with a view of giving a preference to certain of their *bona fide* creditors, and of this I think there is no doubt, that was permitted by the law of this state, and until the 1st *June*, was not prohibited by the act of congress, and, therefore, they were not fraudulent. The order in question, however, was given after the 1st *June*, and when, it is insisted, a bankruptcy must have been contemplated.

It is difficult to reconcile the fact of the bankrupts' having pledged all their property for the payment of their debts, with a belief, that at the time this order was given, a bankruptcy was not contemplated. Their situation appears to me to have been hopeless, and the whole course of their conduct, for many months before the date of the order, looks as if they were meditating on the best means to procure a discharge from their creditors, by surrendering to them all their property. Still, however, there is the positive testimony of *Mark*, who was a competent witness, and whom the jury must have believed, that the order was not given in contemplation of bankruptcy, and that he had no expectation of becoming a bankrupt, a fortnight before the commission issued. *S. Jones's* testimony strongly supports that of *Mark*. He says, that *Mark* appeared to think he should be able, ultimately, to pay his debts ; and that he persevered in that belief, until very shortly before he became a bankrupt. I think it probable, that *Mark* was sincere in the belief. The property of the bankrupts consisted, chiefly, of very large tracts of new lands, the value of which they did not understand, and greatly overrated ; and this is not the first time that this species of property has proved a most deceptive and precarious source of relief against the pressing calls of numerous and importunate creditors. Upon the whole, the question, whether a bankruptcy was contemplated, or

ALBANY,
Feb. 1808.

Whitney
v.
The tertenants
of Crosby.

not, when the order was given, has been twice fairly sub-mitted to a jury, who have found for the defendant; and taking into consideration, that the bankrupt law is re-pealed, and that it probably never will be re-enacted, be-cause no attempt has hitherto been made for that purpose, and that the sum in controversy would afford, as it were, but a nominal dividend among the creditors, we are against the interfering with the verdict; and, consequent-ly, the motion for a new trial must be denied.

Rule refused.