Johnston, Chancellor.
The authorities cited at the hearing o'f Yaughan v. Evans, 1 Hill C. R. 414, certainly left on my mind a strong impression that the mere exaction of a release from accepting creditors, would invalidate the assignment of an insolvent debtor. Under the influence of that impression, I put the defendant’s counsel to open the argument of this case. The result of a careful considerarion of all that was advanced on both sides, is a thorough conviction that such a position is unfounded, either on principle or decided cases.
I am happy to find, on a recurrence to Yaughan v. Evans, that as the Court was not called upon to express, so it did not express an opinion as to the soundness of the position I have mentioned. As I shall have occasion to advert, hereafter, to the authorities referred to in that case, I shall take that opportunity to show that neither those authorities nor that case establish the doctrine in question.
Whatever doubts may have been entertained or expressed, respecting the morality or .the policy of permitting a failing debtor to prefer some of his creditors over others, his legal right to do so is too well settled to admit of discussion.
Chancellor Kent, while he expressed the strongest repugnance to the exercise of such a power by the debtor, was compelled to admit its legality: and our own Supreme Court was constrained by the force of authorities to adopt a similar conclusion. — 2 John. Ch. Rep. 518, 283; 1 M’C. Ch. Rep. 441, 442.
*342 There is undoubtedly great force in the objection brought against this power to prefer. But a contrary judgment has, for a great length of time, and Very uniformly, been practically pronounced by those most deeply interested; and who must, therefore, be taken to have attentively considered the subject in all its bearings upon the actual concerns of life.
When we turn to the jurisprudence of England, we find that that people has never deemed it prudent or practicable to lay sweeping restrictions upon preferences, except in cases of traders. Eor that class of persons the Legislature has provided a specific statutory code : but in cases not falling within it, a much wider range of preference has ever feeen ah°we<l hy the Courts, than in most of these ^States; yet -* nothing has come from Parliament to show that it regarded these judicial decisions as subversive of true policy. Indeed, the very fact that their bankrupt laws have been confined to traders, shows that in their estimation they are unsuited to the mass engaged in the other avocations of life : else, why draw the distinction ?
Two things seem essential to a bankrupt system. First — that the subjects of it should be such as from the nature of their business, and the habits iucident to its successful prosecution, have it in their power to be informed, and are generally informed, when insolvency has supervened. This information gives them warning when to stop. It shows them precisely when that crisis has occurred, after which any business operation done by them, if allowed to stand, must effect a preference of some one creditor, at the expense of some other; and therefore their engaging in such operation, having such information, demonstrates that they intended to give a preference. It is not with them as it is with others, who, not having the means of being constantly informed of their exact situation, nor the habits leading them to a constant comparison of their effects with their debts, may ignorantly and bona fide do an act, in the prosecution of their ordinary business, which may result in a preference among their creditors. With regard to the mass of the community, this difficulty occurs, therefore, which does not exist as respects traders. You must allow them to give preferences, and that wilfully, or you must put an end to all their dealings ; for if allowed to deal at all, preferences will necessarily result, and it will be impossible to separate those which are designed, from those which are not. If you could pronounce, as in the case of traders, that all preferences given by them must, probably, have been given wilfully, you might set your face against them all; but this you cannot do. See the difficulty. Will you declare that no debtor shall confess a judgment, or give a bond or a mortgage ? If he is allowed to do so, a preference may result. But if you prohibit him, every debtor must (at the peril of costs which must fall on him, or, if insolvent, on the mass of his creditors) stand suit, and obstinately and dishonestly defend himself against every just demand. Again, wall you require every plain man, when payment is demanded, to stand still and enter into a calculation how much he is worth, and how much he owes, before he can venture to *4.4.«n ou^ ^he mone7 he has in his pocket and *make payment ? If •J he is not prohibted from paying, it may turn out that from his reserved property proving insufficient, a preference has been given. In short, can you, as to the mass of men, prevent preferences, without putting-verbal and written, parol and special contracts, all on a footing; and *343 then attaching- a lien (and the same lien) to all; or abolishing all liens ? If you do this, you stop all commerce. As long as the law recognizes a distinction between sealed and unsealed instruments; between bonds, mortgages and judgments, and between the liens of judgments and executions, preferences are inevitable. The very execution of the instrument may raise the preference.
The second thing essential to a bankrupt system, seems to be, that those to whom it is to be applied shall form a distinct class, engaged in well defined and unmixed pursuits. Even in England, where avocations have a distinctness as yet utterly unknown to us, much confusion exists in the application of their system, and much injustice arises from its enforcement, owing to the intricate relation which must exist between its subjects and all other portions of the community. But here, where as yet men are in the daily habit of changing their pursuits, and where in fact almost every man is engaged in a variety of avocations at the same time ; where there is no such thing as a regular division of labor or employments, and where, from the intricacy and variety of the relations of citizen to citizen, no provision of law can be applied to any one without greatly affecting others, it is very doubtful whether anything like a bankrupt system is suited to our condition; or whether any restrictions, other than those which experience has shown to be expedient for the mass of men, can be adopted. What says experience on this subject ? The federal government, after testing the expediency of a bankrupt system by experience, suffered it to expire, and has not renewed it. 4 Wheat. 122. And although each State has the right, when no such system is in exercise by the federal government, to institute one for itself, it is believed not a single State has at any time, by statute, forbidden all preference among creditors. The insolvent laws of most of the States either allow the debtor to draw a distinction among his creditors, in the very act of surrendering under the law itself or sustain it if already drawn. So much for the legislatures.' With regard to the opinion of the judiciary, it is remarkable, that in those States where the Courts set out with a simple allowance of *preferences, no change has been found necessary; . .„ while in those in which they attempted to put them down by L' straining after exceptions to the acknowledged law, they have found it impracticable to carry out their decisions to a system ; and many of them have either vaccillated or been compelled, more or less, to retrace their steps.
Surely there is something in all this calculated to raise a doubt whether there is not some fallacy somewhere, in that reasoning which indiscriminately condemns all preferences. Surely, when we see such a long and uniform toleration of the reprobated practice, we must set it down either to the genius of our people, or to a settled conviction in those most conversant with the subject, that if it produces injustice, it is such injustice as human laws cannot remove, unless, indeed, at the hazard of greater evils; and thus we shall be bronght the more cheerfully to acquiesce in what our own judgments, or our own feelings, may not in all respects approve.
Chancellor Kent, 2 Johns. Ch. Rep. 518, states his objection to preferences among creditors with his accustomed force. “Experience,” says he, “ shows that preference is sometimes giveii to the very creditor who *344 is the least entitled to it, because he lent the debtor a delusive credit; and that too, no doubt, under assurances, or a well grounded confidence of priority of payment and perfect indemnity in case of failure. How often,” he continues, “has it happened that that creditor is secured, who was the means of decoying others, while the real business creditor, who parted with his property on liberal terms and in manly confidence, is made the victim ?” Now, is it not apparent that in the Chancellor’s own mind there is a wide distinction between the two classes of creditors he has mentioned ? That one is more and the other less entitled to be preferred ? That he would approve a preference, if made on grounds which he could sanction ? And, after pointing out so forcibly the distinction between him who colludes with the debtor and the fair business man, who is entrapped, is his conclusion a sound one, that the proper corrective is not to examine the evidences of the collusion, and frustrate the fraud; but to put the least meritorious and the most meritorious — him who perpetrates, and him who is the victim of fraud, all on the same footing ?
Let us hear the Chancellor further: — “ Perhaps,” says he, “ some *4501 influential creditor is placed upon the privileged list, to ’¡'prevent disturbance, while those who are poor, or are minors, or are absent, or want the means or the spirit to engage in litigation are abandoned.” This picture is well drawn, and addresses itself to our best feelings. But I apprehend the Chancellor would not vacate & judgment obtained by the creditor he singles out. And if not, it deserves to be considered whether the absent, or the minors, or those wanting in means or spirit for litigation, are not just as likely to be left behind, if the preference is left to be established by priority in obtaining judgments.
In some of the cases wherein the assignments of debtors have been set aside, the instant effect of the decision was to create an inequality among the creditors, and to give a preference to the creditor, whose ground of complaint was that all were not put on a footing. 20 John. Rep. 451. The Court, struck with the glaring inconsistency of this, with that equality at which it vainly aimed, has usually attempted to console itself and the suitors and to cover over the contradiction, with the maxim, vigilantibus non dormientibus, leges subserviunt. But what is that, but to admit that the law allows the vigilant to be preferred ? It is preference still.
Now, while I deny that it is a natural application of the maxim, vigilantibus, non dormientibus, to give the benefit of it to him whose only necessity for coming into Court was, that another, by superior vigilance, had obtained superior rights, of which a Court only could deprive him, and to deny it to that other; while I contend that this is an inversion of the maxim — while I contend that the creditors who took th'e assignment in this case, have not been less vigilant, but more vigilant, than the creditor who has obtained a judgment; I am at a loss to perceive what moral principle it is, upon which those would proceed, who would set aside conveyances and liens existing — who would disturb things as they find them, merely because they give a preference — and substitute in their room a preference, to which the only title, is vigilance. Yigilance is a very good thing; and if left to depend on that, preferences would not be disturbed. But if they are to be disturbed, is vigilance the only moral quality entitled to consideration ? Suppose the preferences complained *345 of, besides being founded on superior vigilance, and sound legal considerations, rest on motives of generosity, humanity, gratitude, piety to parents, parental or conjugal affection, shall these all go for nothing ?
The plain truth seems to be, that it is impracticable as to the mass of men, to put all creditors on a perfect equality : and if it *was prac- r*, ci ticable, injustice would often follow, 10 Mod. 459. Undoubtedly L the power to prefer, may be perverted and abused, even where the abuse discloses no fraud upon which a Court can seize: but “ the power, as it may be abused, so, on the other hand, may be very properly exercised.” The discretion must be left to the debtor, within the limits of fraud." Society must depend for its indemnity upon the teachings of the debtor’s heart and conscience; upon those moral lights, which all men possess; upon that native sense of justice; upon those better feelings, which exert a silent supremacy over even the worst of men. After all, most of the great interests and operations of society, depend mainly upon these. The law can only act in flagrant eases. 15 John. Rep. 511.
But, without protracting these observations, I found myself upon this: that whatever may be thought of the morality or expediency of permitting a debtor to grant preferences, his legal right to do so is unquestionable. 2 P. W. 421; 10 Mod. 489; 5 T. R. 424; 8 T. R. 528; 3 John. Rep. 84.
Then, Ralph Johnson’s assignment would not have been invalid, if he had simply preferred his other creditors over the plaintiff. It would have been clearly valid, if he had surrendered to the other creditors without condition. I suppose it would have been equally valid, as against the plaintiff, if in his surrender to them as privileged creditors he had required releases from them. Such a requisition, so far from being the subject of just complaint with the plaintiff, would have operated greatly to his advantage, by freeing the debtor’s after acquisitions from claims which might otherwise have stood in the way of his obtaining satisfaction of his debt.
Then, if it would have been no fraud on him to prefer others over him, with or without conditions, is he defrauded by giving him an opportunity to participate with them ? — An opportunity which it would not have been fraudulent in Johnson to have withheld from him ?
If he refuses to accept the condition, he is only thereby, and that by his own act, reduced to an unpreferred creditor. Not only is he left uninjured, but, as I remarked before, he is positively benefitted by the condition, although he has not accepted it: the acceptance of it by others, having warded off competing claims from the debtor’s after acquisitions.
I am not aware of any decision in this State, which concludes any thing on this point. Certainly it did not arise in the consideration *of p*,-9 Evans’ assignment. 1 Hill C. R. 414.- The authorities quoted L agaiust that assignment, consisted of cases in which debtors had required a release from their creditors. There was no such provision in Evans’ deed; and the Court took notice of the fact, that the cases quoted turned upon the requirement of a release, for the purpose of showing that they did not apply to that deed. The Court did not, as the occasion did not demand it, enter into an examination of the circumstances under which, in the cases quoted, the releases were exacted; so as to determine whether that simple requirement, without any other circumstance, would *346 invalidate an assignment. It pronounced no opinion respecting the soundness or unsoundness of the decisions referred to. It merely pointed out their inapplicability to the case on trial.
Nevertheless, the impression they left on me certainly was, that the mere requiring a release would avoid an assignment: and such, I believe, was the impression they produced ou the Court of Appeals.
But upon a careful examination of the cases I have mentioned, and such others as are accessible to me, I have not found one wherein fraud was inferred, merely from such requirement. I will first turn to the cases referred to in Vaughan v. Evans, 1 Hill C. R. 420, for the purpose of setting out more particularly than I did in the decision of that case, the provisions which the assignors coupled with the requisitions of a release, in order to enable them to drive their creditors to terms.
In Lord v. The Watchman, American Jurist, No. 16, p. 284, the trustees were to sell the property, and after paying such creditors as might accept upon the conditions required, pay over the surplus, (notwithstanding there might be dissenting and unpaid creditors) to the assignor.
Hyslop v. Clark, 14 John. R. 459. The assignment contained a provision, that if any of the scheduled «editors should refuse to release, the trust for paying them ratably should not be executed by the trustees ; but instead thereof, in that event, the trustees should hold the assigned property in trust, to pay Hyslop & Co. in the first place, and then such other creditors as the assignors should appoint; and upon the further trust, in any event, to pay the surplus (without regarding dissenting or unpaid creditors) over to the assignors.
In Seaving v. Brinckerhoff, 5 John. Ch. Rep. 332, not only was the assigned property bound by judgment aud execution, but the assignment provided *that the trustee should sell the property, and “if the J creditors would not accept upon the condition imposed,” (that of releasing and receiving ratably,) "the moneys were to be held in trust for the grantors.”
Thus, it appears, that the debtors, unless the creditors would obey their commands, secured to themselves, a right to have their property reduced to a new form intangible by their creditor’s executions, and difficult of access by any process, and in this form re-delivered to themselves. This right to a re-delivery was not a resulting trust merely ; but was secured by express provision in the assignment: so that the trustees were bound in strict compliance with their duty, and might have been compelled to convert the property to money, and pay it over to the debtors ; and nothing but arresting them, and declaring the assignment void, could have prevented this.
This contrivance, this reservation of control over the property, this putting it out of reach of the creditor’s process, was held in terrorem over the creditor’s heads, unless they would release; and this constituted the fraud which vitiated the assignments. The effort was to put the property out of the reach of the law, and in the hands of trustees so constituted as to be mere instruments in the hands of the debtor, and utterly withhold it from the payment of debts, unless on the debtor’s own terms. It was not a fair surrender of the property, either with or without'eonditions. A control over it was still reserved. It was not surrendered. *347 The language was, “ I will not surrender unless you come to ray terms ; if you refuse, the property is sold, and being out of your reach, I will hold fast the avails, and defy the law.”
In Austin v. Bell, 20 John. Rep. 442, 448, the deed of assignment required the trustee to pay back to the debtor the proportions of such creditors as should refuse to release. Chief Justice Spencer insists on the distinction between this provision and that contained in the deed, in Murray v. Riggs, 2 John. Rep. 577, in which it was stipulated that the shares of the dissenting creditors should be thrown into the general mass, for the benefit of the accepting creditors. 15 John. Rep. 571. He shows, by an examination of cases wherein assignments had been set aside, that the vice lay not merely in requiring a release, but in putting the assets in such shape as to be inaccessible to ordinary process; 20 John. Rep. 450, and then establishing, by the express terms of the trust, such control over them, in the grantor, that he could make or withhold payment, at *his pleasure, accordingly as his creditors should submit to or reject the terms dictated by him. *-
Our own insolvent debtor’s Act of 1159, confirms me in the opinion that, whatever the law may be elsewhere, in this State, at least, a debtor may lawfully assign his whole estate for the benefit of such creditors as will release him.
That Act, P. L. 241-8-9, after reciting among other things that “many persons ” (whom, so far from condemning, it pronounces to be “proper objects of compassion ”) “ may be willing to satisfy their creditors to the utmost of their power,” provides, that if any person sued, impleaded or arrested, “ shall be minded to make surrender of all his effects, towards satisfaction of the debts wherewith he stands charged, or in which he shall he indebted to any persons whatsoever,” he may file a petition, accompanied with a schedule of his effects, in the Courts of law ; who shall, thereupon, cause not only the suing creditors, but “all other the creditors to whom he shall be indebted, to be summoned.” On a day fixed, the debtor is to take an oath, prescribed by the Act, that his schedule contains a full account of his effects and credits, both at the time of filing the petition and of taking the oath ; and that he has not, otherwise than as mentioned in the schedule, assigned or disposed of any part thereof, in such manner as thereby “ to have or expect any benefit or profit to himself, orto defraud any of his creditors.” The Court, if “satisfied with the truth of the oath taken ” by the debtor, shall (after making certain reservations of property dictated by humanity) order the effects specified in the schedule to be assigned by the debtor to persons to be named by the Court; which “ assignment shall be in trust for the suitors and such other creditors of the petitioner, as shall he loilling to receive a dividend of his effects, and shall within twelve months from the time the petition was filed, make their demands.”
Now, for the effect of this. The Act gives it the operation of a release from all the accepting creditors. It provides that the debtor shall, upon executing the assignment, and delivering his effects, so far as he has • power over them “ be forthwith discharged from such suits, and shall also, thenceforth, be acquitted and discharged from all such other of his creditors, as shall have received their dividends as aforesaid.”
It does appear to me, that Ralph Johnson has acted in the very spirit *348 of this statute. He has made the very assignment which it requires him ‡ *to make; and which, if executed under compulsory process, the J Act declares, would have released him from all accepting, and been valid against ail dissenting creditors.
Surely it cannot be a fraudulent evasion - of the law to do voluntarily what that same law would sanction if done under process.
It seems no answer to this, to insist that an insolvent, proceeding under the Act assigns under strict scrutiny and under penalty of perjury. The scrutiny is to ascertain whether the debtor’s whole estate is included in the assignment, and the perjury is in swearing falsely that it is. But the bill admits that Johnson has assigned his whole estate ; thereby conceding the truth of what the Act would have required him to swear; and rendering unnecessary any scrutiny whatever. If the bill had not done this, then the plaintiff would not have stated a case rendering the aid of this Court necessary to him ; inasmuch as, for aught that could be known, Johnson might still have had in hand enough property to satisfy his debt.
An argument was urged, that if no creditor, or but one creditor, holding an inconsiderable demand, had accepted under Johnson’s deed, a trust would have resulted to Johnson for the residue of the assigned property; that this would have given him a control over the fund, enabling him to coerce the creditors into the execution of releases ; and that the deed was, therefore, void for fraud at its execution ; and was not cured by the subsequent acceptance of creditors to an amount sufficient to exhaust the fund.
If the case put by the objection had actually occurred ; if after a full surrender by Johnson of all his effects, a trust had resulted to him, and had resulted merely in consequence of the non-acceptance of creditors, I apprehend this would not have vitiated his assignment. (Prec. Ch. 605; 5 T. R. 420 ; 2 John. C. R. 579, 580.) The authorities draw a distinction betweep a resulting and an express trust to the assignor; between cases where the debtor has reserved a control, and given himself a preference over the creditors, and those in which he has surrendered all, in terms which give them’ a preference over him. If a trust result in the latter case, the remedy of unpaid creditors is to be let in to an account of the surplus in the trustee’s hands
The existence of this distinction renders it unnecessary to inquire wheth®1' the acceptance or non-acceptance of the other creditors* J was not matter for their exclusive consideration, and not for the consideration of the plaintiff. (2 Bin. 174, 182.)
It also renders it unnecessary to inquire whether the supposed defect’ has not been cured. If it were not unnecessary, to go into this inquiry, the inclination of my mind is against the plaintiff The other creditors have, by closing with the offers made them, made a case in which no over-plus can result to the debtor’s hands; so that he has not any fund, by a control of which he can dictate terms to the plaintiff. It would seem unreasonable to say, that under these circumstances the plaintiff should be allowed to resort, not to the actual case, but to one now altogether supposititious and put beyond therange of possibility, and found a complaint thereon ; especially since the entertaining that complaint can have no other effect than to divest the other creditors of rights which it has been shown, I think, they hold without fraud on him.
*349 The only thing remaining for consideration, is whether the sale made by the assignors is valid. It appears that they called upon the creditors to appoint an agent, under the Act of 1828 ; and that the creditors failed to do so. (Acts 1828, p. 32.) The sale is therefore valid. Indeed, I did not understand the plaintiff’s counsel to contest the sale, but only the validity of the assignment; professing a willingness, if the assignment should be avoided, to take an account of the avails of the assigned property in the trustees’ hands.
Upon the whole, I feel bound, much against my first impressions, to sustain the assignment. But as I conceive the plaintiff had strong grounds to question its legality, each party will pay his own costs.
If the plaintiff chooses to have an account of any surplus which may be left after paying the accepting creditors, the bill will be retained until the next term, to give him an opportunity. It is decreed that it be dismissed, in all other respects; and that each party pay his own costs : those of the trustees, to be allowed them out of the assigned fund.
On an appeal by the plaintiff from this decree, the question as to the validity of the assignment, was argued at length by Weihers for the appellant. The Court concurring with the Chancellor, the decree was affirmed.
^Chancellors De Saussure, Joiinson and Harper, and Justices p¡., O’Heall, Evans, Earle and Btjtler, concurred. *-
Gantt, J.
I entertain serious doubts as to the correctness of the principle established by this decree. Indeed I feel satisfied that it is in violation of the constitution.
Richardson, J., absent.