# CASES

## COURT FOR THE TRIAL OF IMPEACHMENTS

## CORRECTION OF ERRORS,

## *STATE OF NEW-YORK;*

FEBRUARY, 1809.

---

DANIEL PHŒNIX, } *Appellant,*

*against*

ANTHONY DEY, JOHN TAYLOR, and JACOB SCHIEFFELIN, assignees of NATHANIEL G. INGRAHAM, a bankrupt, } *Respondents.*

*IN ERROR.*

.......

ALBANY,
Feb. 1809.

PHŒNIX
v.
The Assignees of
INGRAHAM.

IN *February*, 1801, a commission of bankruptcy issued against *Nathaniel G. Ingraham,* who was thereupon declared a bankrupt, and his estate assigned to

The answer of one defendant is no evidence against his co-defendant.

Subsequent declarations by a party to a sale or transfer of property, which go to take away a vested right, are not admissible evidence.

A debtor in insolvent circumstances, may *bona fide* give a preference to one creditor, to the exclusion of others; and such preference, though *voluntary,* is valid, unless done in contemplation of bankruptcy. And even if an act of bankruptcy be contemplated by the debtor, yet if, at the instance, and on the application, of a particular creditor, he pays such creditor, or assigns him property, such payment or assignment will be valid, as against the assignees of the bankrupt.

A. who had been discharged under the bankrupt law, and whose estate would not, probably, pay more than 25 *per cent.* was held to be a competent witness, in a suit brought by the assignees of B. a bankrupt, against whom A. had proved a debt under the commission.

IN ERROR.
.......
ALBANY,
Feb. 1809.

PHŒNIX
v.
TheAssignees of
INGRAHAM.

the respondents, in trust, for his creditors. About the beginning of *October*, 1800, he became insolvent, and expressed his inability to pay his notes, which were protested for non-payment. After his public declaration of his inability to pay his debts, *Ingraham*, in *October*, *November* and *December*, 1800, made several *assignments* and transfers of his lands, effects and debts, to individual creditors, which the respondents, in their bill in chancery, alleged, were made with a view to benefit relations, and favour certain creditors, in exclusion of the rest, and in contemplation of bankruptcy. In particular, he conveyed to the appellant, his father-in-law, the first of *November*, 1800, certain lands, of the value of 3,000 dollars, though expressed to be for the consideration of 2,000 dollars ; and in *November* and *December*, 1800, assigned to him several debts and promissory notes, amounting to more than 3,000 dollars.

He also gave to the appellant his bond for 5,000 dollars, and a mortgage on his house, at *Harlæm*, and delivered to him all the furniture in the house ; besides paying him 1,520 dollars in money, and delivering to him 90 hogsheads of sugar, of the value of 3,032 dollars.

He also gave the appellant an order on one *Timothy Southmayd*, to deliver all the property of *Ingraham*, in his possession, to the appellant; and which the appellant received, to the amount of 3,000 dollars.

He also transferred to his brother-in-law, 21 shares in the *Manhattan* bank, in trust for the wife of *Ingraham;* and which were assigned, afterwards, to the appellant, on the same trust.

All these assignments, payments, and transfers, the respondents alleged, were made after the known insolvency of *Ingraham*, when he either had committed an act of bankruptcy, or had it in contemplation to become bankrupt, and with an intention to give the appellant an illegal preference and security. The respondents' bill

IN ERROR.
......
ALBANY,
Feb. 1809.

PHŒNIX
v.
The Assignees of
INGRAHAM.

prayed for a general discovery, for an account, and for general relief against the appellant, and *Ingraham* and his wife.

The appellant, in his answer, stated, that he did not know when *Ingraham* became insolvent, but admitted that he might have been insolvent, at the time stated by the respondents, as he did not, at that time, generally pay his notes, though he paid several notes afterwards. From the 11th *May*, 1798, to the 16th *October*, 1800, he, at various times, lent money to *Ingraham*, paid his notes, and advanced him ready money, which were particularly specified, and stated in an account, and amounted to about 19,000 dollars, to secure him for the sum of 5,000 dollars, lent in 1798, and a note for 2,000 dollars, endorsed in *July*, 1800, *Ingraham*, in *August*, 1800, executed the mortgage on the house at *Harlæm*, which was sold under a decree of the court of chancery, to which the respondents were parties, for 3,000 dollars, and no more. In *October*, 1800, and afterwards, the appellant, not thinking himself sufficiently secure, applied to *Ingraham* for further security, who conveyed to him the land for 2,000 dollars, which he believed to be it real value, and assigned to him some notes and debts, amounting to about 2,000 dollars ; and on the 4th *November*, 1800, the 21 shares of the *Manhattan* stock, which stood in the name of Mrs. *Ingraham*, were transferred to the appellant, for his own benefit, in consideration of the advances made to her husband, and not in trust for her. That in consequence, also, of his application to *Ingraham* for further security, the appellant obtained a bill of sale of the furniture, worth about 70 dollars, a policy of insurance, a mortgage on some lots in the city of *New-York*, and a quantity of molasses.

The appellant denied that *Ingraham*, to his knowledge or belief committed an act of bankruptcy until *February*, 1801 ; and that he did not know that he contem-

In *Smith* v. *Payne*,[*] the creditor knew the debtor to be in distressed circumstances, and unable to pay his debts, when he applied for security, and received part of the debtor's stock in trade, yet this was held to be a valid transaction, though the creditor did not threaten a suit.

A voluntary payment is void, unless made in the ordinary course of business; but giving security, on the request of a creditor, is necessarily in the ordinary course of business; and, in this case, it was strictly so. That the creditor knew of the insolvency, or impending bankruptcy of the debtor, does not alter the case.

In *Hartshorn* v. *Slodden*,[†] the creditor knowing the debtor to be in failing circumstances, applied to him, and received goods out of his shop, for a bond not then due, and the payment was held to be valid. A creditor is under no legal or moral obligation, not to gain a preference; and where he sees the affairs of his debtor, going to wreck, he may seize the *tabula ex naufragio*. The distinction is between a *voluntary* preference, and a preference at the instance or importunity of the creditor.[‡] It will be found to be laid down in all the cases, that a creditor may, by application, or using diligence, obtain a preference. If some of the securities were not given at the immediate instance of the appellant, they were clearly given in consequence of such application.

The testimony of *Prime* and *Dickson*, can be admitted for no other purpose than to discredit *Ingraham ;* and admitting that to be the effect of their evidence, then the cause rests simply on the bill and answer, and the appellant having denied all the equity in the bill, it ought to be dismissed. But *Prime* having elected to proceed under the commission, for his debt, was clearly incompetent. And *Dickson* was incompetent, though his interest was remote ; for a bankrupt is always incompetent, without a release, until his affairs are settled.

IN ERROR.
......
ALBANY,
Feb. 1809.

PHŒNIX
v.
The Assignees of
INGRAHAM.

[*] 5 *Term Rep.* 152.

[†] 2 *Bos.* and *Pull.* 582.

[‡] *Doug.* 89. *Cowp.* 124. 629. 1 *Term Rep.* 156. *note.* 6 *Term Rep* 152. 1 *Vesey,* jun. 280. 3 *Vesey,* jun. 85.

IN ERROR.
......
ALBANY,
Feb. 1809.

PHŒNIX
v.
TheAssigneesof
INGRAHAM.

SPENCER, J. By the decree of the court of chancery, in this case, all the conveyances, assignments, securities and payments, made by *Ingraham*, the bankrupt, to the appellant, or for his use, stated and set forth in the bill of complaint, and which were made subsequent to the 6th of *October*, 1800, are adjudged to be fraudulent and void, as against the assignees of the bankrupt, and are set aside, and the appellant is ordered to account for, and pay to the respondents all moneys received by him, being the proceeds of property, or securities so assigned, and to assign and reconvey such as had not been disposed of by him. The decree refers several things to the master, which it is not necessary for me to state.

In considering this case, I shall confine myself to the examination of two points only.

1. Whether there was sufficient evidence to authorize the conclusion, that *Ingraham* contemplated an act of bankruptcy, when he executed the conveyances, and made the assignments and payments to the appellant, which have been adjudged fraudulent and void.

2. Whether, if *Ingraham* did, at that time, contemplate an act of bankruptcy, the application of the appellant to him for further security, and the giving the same accordingly, were not valid acts, notwithstanding a subsequent act of bankruptcy.

I shall not enter into a repetition of the various facts in the case, but shall notice such prominent ones, as are necessary to the consideration of the points proposed to be examined.

There is one fact beyond all controversy, that the appellant had advanced to the bankrupt, at various times, large sums of money, and furnished him with his credit for other sums, which, eventually, the appellant had to pay. These advances began in *May*, 1798, and were continued down to the latter part of the year 1800. These loans appear to have proceeded from the relation which existed between the parties, the appellant being

*IN ERROR.*

......

ALBANY,
Feb. 1809.

PHŒNIX
v.
The Assignees of
INGRAHAM.

the father-in-law of the bankrupt, who was doing business as a merchant, and whose exigencies seem to have required the appellant's aid. The motives to the advances he made, may be considered as dictated by friendship, and with a view to aid the bankrupt in his business. The appellant stands before the court in a meritorious light, and will be protected in any security he may have legally acquired.

The only evidence in chief, in the cause, on which the respondents can rest to make out that *Ingraham* contemplated an act of bankruptcy, when he gave the appellant the securities, attempted to be set aside, is his answer on oath, and the testimony of *Ingraham*, a witness on the part of the appellant.

The answer admits that the appellant believed *Ingraham* to be insolvent, about the time mentioned in the bill, which I presume to be the 6th of *October*, 1800, and that he did not, in consequence thereof, generally pay his notes at the bank, or elsewhere; it alleges that *Ingraham*, until a short time before he was declared a bankrupt, always appeared solicitous to avoid doing any thing that might be deemed an act of bankruptcy, and that *Ingraham* did not, to his knowledge or belief, commit an act of bankruptcy until *February*, 1801, and that the appellant did not know whether he had it in contemplation or not, at the times when the securities were given, to become a bankrupt.

The testimony of *Ingraham* states, that after the month of *October*, 1800, he continued to do business as a merchant, almost to the time when he was declared a bankrupt, and that he paid several notes and other debts to a large amount; that at the time of giving the moneys and securities to the appellant, he had no intention of becoming a bankrupt, nor did he make any such conveyances, assignments or payments in contemplation of bankruptcy.

IN ERROR.
......
ALBANY,
Feb. 1809.

PHŒNIX
v.
The Assignees of
INGRAHAM.

The most which can be deduced from this evidence is, that *Ingraham* was insolvent; but it expressly rejects the idea that the acts done were in contemplation of bankruptcy. Reference has been had to the answer of *Ingraham*, and to the testimony of *Dickson* and *Prime*, to impeach that part of his evidence, which denies that what he did to secure the appellant, was in contemplation of bankruptcy; if it be admitted that his answer and the declarations he made, completely produce that effect, still the fact is to be made out affirmatively, that the preference given to the appellant, was in contemplation of bankruptcy: For no propositions can be clearer, than that the answer of one defendant is not evidence against his co-defendant; and that the declarations of a party to a sale or transfer, going to destroy and take away the vested rights of another, cannot, *ex post facto*, work that consequence, nor be regarded as evidence against the vendee or assignee. The book which *Prime* says *Ingraham* showed him in *December*, 1800, in which were the names of certain creditors who were his friends, and whom he said he had secured to a large amount, since his failure, as he was determined his friends should not suffer, stands upon the same principle; for if the subsequent declarations of a party making a sale and transfer of his property are not evidence, surely the *ex parte* acts of such person cannot be evidence.

If then the *ex post facto* acts and declarations of *Ingraham*, are not evidence against the appellant, and can only be used to impeach *Ingraham's* testimony, admitting that testimony so far to be impeached, there is no evidence of an act of bankruptcy contemplated, nor any circumstance from which to infer it, but the simple fact of *Ingraham's* insolvency; and the court is without any evidence to show the nature and extent of this insolvency, and whether it was irretrievable and desperate, or not.

That an insolvency is no objection to giving a preference, unless it be shown that a bankruptcy was con-

IN ERROR.
......
ALBANY,
Feb. 1809.

PHŒNIX
v.
TheAssigneesof
INGRAHAM.

templated at the time, was decided in the supreme court, in the case of *M'Menomy* and *Townsend* v. *Ferris*. (3 *Johns. Rep.* 82.) That principle will be found admitted and acted upon, in a great variety of cases. It is founded upon the right which every man has to dispose of his property to whom he pleases, for an adequate consideration, and in satisfaction of his debts, until he commits an act of bankruptcy, or contemplates so to do; and where a part only of the insolvent's estate is transferred for the payment of a just debt, though the act be voluntary on the part of the insolvent, the transaction is not, on that ground, impeachable.

I have hitherto supposed that *Dickson* and *Prime* were competent witnesses, and that their testimony had produced the effect of discrediting *Ingraham*, in that part of his testimony, which goes to deny that he contemplated bankruptcy, when he gave the appellant the securities for his debt. I do not propose to enter into a minute discussion of the question of their competency; because, if they were competent, and the fullest effect be given to their testimony, it does not go to make out the fact, that bankruptcy was contemplated, as it is not evidence in chief. *Dickson* appears to me to have been a competent witness; his interest being remote and contingent. This is not the case with *Prime*; he was a creditor of *Ingraham's*, had proved his debt under the commission, and had a right to a distributive part of the bankrupt's estate, and his testimony went directly to increase that fund. *Prime's* debt was not extinguished by the transaction in which he acted as broker for the firm of *Ingraham, Phœnix* and *Nixen*. There are cases in which the rendering an account and an acquiescence in it, for a considerable time, by the party to whom it is rendered, will preclude that party from disputing the *items*, or calling for vouchers to substantiate it. In the present case, there is no controversy as to vouchers. *Prime* clearly had no right to make the charge against the firm; he has not

*IN ERROR.*

......

ALBANY,
Feb. 1809.

PHŒNIX
*v.*
The Assignees of
ING AHAM

been credited the money; and although he has not been resorted to for payment, nothing has taken place to absolve him from his responsibility.

On the second question, how far forth payments obtained by a creditor, on his application, after the debtor contemplates an act of bankruptcy, but before one is, in fact, committed, are to be upheld, I confess I have little difficulty. It will be unnecessary to go into an elaborate examination of the cases ; but it may be safely advanced, that there is not a case to be met with, which denies this position, that if even an act of bankruptcy be contemplated by the debtor, yet if, at the instance, and on the application of the creditor, he makes payment, or assigns property, such payment or assignment is valid, as against the assignees of the bankrupt. As to the degree of pressure, or the urgency of the solicitation, this case comes within the principles sanctioned by the opinions of very distinguished judges.

In the case of *Hartshorn and another* v. *Slodden*, (2 *Bos.* and *Pull.* 586.) the debt was not due, and both parties knew that there could be no legal process made use of ; yet the court decided that the preference was legally acquired, on the principle, that if a security be *bona fide* given under the impression of an obligation, and not springing from the voluntary act of the bankrupt, such security is good ; and in that case the preference was given when the debtor was in failing circumstances, and that known to the creditor, and the motive of his conduct. So, also, in the case of *Thompson* v. *Freeman*, (1 *Term Rep.* 156.) there was no existing debt which could be enforced; still the act creating the preference was upheld, on the principle that it was not voluntary, because it was not spontaneous.

In the case of *Yeates* v. *Groves*, (1 *Vesey*, jun. 280.) the Lord Chancellor held that insolvency was no objection to the creditor's receiving payment, for that the bankrupt being in failing circumstances, is a good reason

for pressing him. I assent to the principle, that a credit-
or is not restrained, either by law, or the principles of
morality and good faith, from obtaining payment of his
debtor, until the very moment an act of bankruptcy is com-
mitted; and until then, there is no legal restraint on the
bankrupt from giving a preference, provided it be not
by his own unsolicited, voluntary act; if the gaining a
preference, by the act of the creditor, is not unlawful,
if the debtor is not restrained from parting with his
property, on the application, and at the instance of his
creditor, how is it possible that such an act, valid in all
its parts, can be considered fraudulent and void? It ap-
pears to me to be contrary to a maxim long established
in courts of equity, that where the rights of persons are
equal, and where each has the same equity, and one has
obtained a plank, by which he can save himself at law,
equity ought not to devest him of it.

That the appellant obtained his securities on applica-
tion, is manifest, not only from his answer, but from
the evidence of the bankrupt. It has been urged, that
the application went only to a part of the securities, and
that a policy of insurance, effected in *Philadelphia*, which
formed a part of them, had been exchanged by the ap-
pellant with the bankrupt, for a cargo of molasses; and
thus, with respect to the molasses, the preference was
lost. It appears to me, that the evidence warrants
the conclusion, that all the payments and securities
given by the bankrupt, were in consequence of ap-
plications by the appellant; and if the policy was valid
in his hands, the molasses which was its substitute, stands
on the same footing.

On both of the points, which I have thus briefly con-
sidered, it appears clearly to me, that the fact and law
of the case have been mistaken, and, consequently, that
the decree must be reversed.

It has been suggested, that an account ought to be di-
rected, as there is in the appellant's hands a balance due

the respondents, as assignees of *Ingraham;* there appears no foundation for the suggestion; and to direct an account, under these circumstances, would be productive of useless litigation.

KENT, Ch. J. and VAN NESS, J. were of the same opinion.

THOMPSON, J. and YATES, J. were absent.

The rest of the court concurred; it was thereupon, ORDERED, ADJUDGED and DECREED, that the order or decree of the court of chancery be reversed; and that the bill of the complainants be dismissed, &c.

Judgment of reversal.