United States Bank, and Bacon, Syming-    CHANCERY. ·
ton and Robins, Trustees, *vs* Lewis
Huth.

APPEAL FROM THE LOUISVILLE CHANCERY COURT.          *Case* 88.

*Fraudulent conveyances. Preferred creditors.*

CHIEF JUSTICE EWING delivered the opinion of the Court.          *April* 27.

LEWIS HUTH, holding fifteen several bonds executed    The case as sta-
by the President, Directors & Co. of the Bank of the   ted in the bill.
United States, chartered by the Legislature of Pennsyl-
vania, bearing date the 1st April, 1837, payable on the
1st April, 1847, to bearer, at the office of F. Huth, &
Co. in London, for £1,000 sterling, each, with nine war-
rants or coupons of £25 each, attached to each bond,
for interest at the rate of five per cent. per annum, paya-
ble semi-annually, on the 1st April and 1st of October,
1843, and on the same days in each year thereafter, down
to the 1st April 1847, when the principal was made pay-
able, making a debt of £15,000 sterling money of prin-
cipal, and £3,375 sterling money for interest, exhibited
his bill in chancery, in the Louisville Chancery Court,
under the statute of 1838, to subject choses in action
and in possession, which had been holden by the Bank
in the County of Jefferson, to the satisfaction of his said
demands, in which he charges that the Bank had become
greatly deranged and embarrassed in its affairs, and was
unable to pay its debts, and for the fraudulent purpose of
hindering, delaying and obstructing its creditors in the
collection of their debts, and especially the complainant,
had made a fraudulent assignment of all of its said ef-
fects to John Bacon, Alex. Symington and Thomas Rob-
ins, in trust for certain favorite creditors, &c. &c. and
asked and obtained an attachment seizing the choses in
possession, and enjoining the debtors from paying to
the Bank or the assignees the choses in action.

The Bank and assignees, under an order made against    The statements
them as non-residents, appear and answer the bill, in    of the assignor
                                                          and assignees.

BANK U. S. *et al.*
*vs*
HUTH.

which they admit the assignment of the effects in contest, with others, for the uses and trusts in the deed mentioned; that the trustees had accepted the trust and entered upon and were diligently discharging the duties imposed. They admit that the Bank had become embarrassed and unable to meet its engagements, and with the honest intention of securing the meritorious class of creditors provided for in said deed, the same was made, and not to hinder or delay creditors. They deny the fraud charged, and insist that the deed was duly and fairly made and recorded in the proper office in the City of Philadelphia, where all the parties resided and the greater part of the effects of the Bank were situated. The trustees charge that there are *cestui que trusts* claiming and asserting, and others who had heretofore claimed and asserted, and others again who, beyond question, will claim and assert rights under said assignment.

The trustees deny that the Bank was permitted to retain the possession and control of the effects, or any of them assigned, or the evidences of debts, but say that the agent of the Bank, at Louisville, held the possession and control of all of them at that place, and immediately upon the assignment they notified him of the fact and appointed him their agent, and he afterwards held the same for and under them, and until they were taken out of his possession by a special agent, despatched by them from Philadelphia, who received and delivered them to their attorneys for superintendance and collection. They state that by an act of the Legislature of Pennsylvania, passed the 4th day of May, 1841, they are compelled to receive, at par, the notes and other evidences of debt issued or created by said Bank in payment of the debts assigned to them; and, in conformity to said act, they had received notes of the Bank to the amount of $550,000, all of which they had cancelled in such manner as to prevent, by any possibility, their being again thrown into circulation. They exhibited the deed of assignment, with a schedule of the effects and choses in action assigned, duly executed and accepted by the trustees, by their signatures to the deed and schedule, bearing date the 7th

day of June, 1841, and recorded in the proper office in the state of the residence of the grantors and grantees.

The deed recites "that the Bank, (the party of the first part,) was indebted to sundry persons, depositors in said Bank and branches thereof, and also to sundry persons, holders of notes of the late Bank of the United States, incorporated by Congress, and to sundry persons, holders of notes of the present Bank, being notes of the ordinary kind, payable on demand, and commonly used in circulation; and to sundry persons, holders of notes issued by the Bank, commonly called post notes, (other than post notes held by or issued to certain banks in the County and City of Philadelphia, for which security was provided and given by an indenture bearing date the 1st day of May, in the year 1841, and which are not intended to be provided for or embraced in the present indenture;) and whereas the said party of the first part, (the Bank,) had resolved and agreed to provide an adequate security for the payment of said deposits and of said notes, and of said post notes, (save and except the post notes heretofore provided for as above said,) and of the interest to accrue upon them;" therefore the party of the first part, as well for the consideration aforesaid, as in consideration of one dollar to them in hand paid by the party of the second part, (said Bacon, Symington and Robins,) give, bargain, sell, &c. transfer, assign, and set over to the party of the second part, all and singular the lands, tenements, and hereditaments, goods, chattels, moneys, rights and credits of the party of the first part, contained, described and set forth in the schedule annexed, together with all papers and evidences relating thereto, in trust, "in the first place to enter upon and sell the real estate in fee simple, or any less estate, by private or public sale, for cash or on credit, &c." and in the mean time to receive the rents, &c. "and in the next place, in trust, to collect, receive and get, in all and singular, the moneys due and owing to the party of the first part, and hereby assigned, and the same, as well as the proceeds of the real estate, safely to keep and apply to the uses and purposes hereinafter directed, that is to say:"

BANK U. S. *et al.*
vs
HUTH.

The recitals of the deed of trust.

BANK U. S. *et al.*
     *vs*
  HUTH.

"Firstly. To pay and discharge all necessary costs, expenses and charges attending the execution of the trust, in which, however, it is expressly understood and agreed that the commission charged by or allowed to said trustees shall not exceed one per cent. upon the amount collected, nor amount to more than two thousand dollars in one year to each trustee."

"Secondly. From time to time, as often as they shall have moneys on hand of a sufficient amount for a dividend, to divide and distribute the same, ratably and equally, in and towards the payment of said deposits, notes and post notes, (except the post notes heretofore excepted,) and the interest accrued thereon, so that all and each may participate ratably and alike in every such demand, until the said deposits, notes and post notes shall be fully paid off and discharged."

"And in the further trust, from and after the payment and discharge of the said deposits, notes and post notes, and interest in full, to re-transfer, convey, and pay over to the said party of the first part, their successors and assigns, whatever may remain of the premises hereby granted, and all money, credits, and effects which may have been raised therefrom, or from any part thereof, and not applied to the purposes of the trusts herein and hereby created, together with all deeds, papers, evidences and securities relating thereto."

"Provided always, nevertheless, and it is hereby expressly declared, understood and agreed, as the condition of this indenture, and of the trusts herein and hereby created, that before the said trustees, their successors or assigns, shall proceed to make or declare any dividend of the moneys raised or collected as aforesaid, they shall give thirty days notice of their intention to do so, in two or more of the daily newspapers of the City of Philadelphia, at least twice a week during the same period of thirty days, calling upon the claimants to come forward and prove their debts; and such dividends shall be declared and made only on the amounts so brought forward and proved; and no creditor shall be entitled to claim or receive such dividends, who shall not have brought forward and proved his debt before the time appointed for making

and declaring the dividend. But if any further demand or demands shall thereafter be made, such neglecting or defaulting creditor or creditors, bringing forward and proving his or their claim or claims, in time therefor, as aforesaid, shall be entitled to receive, in addition to such dividend, an amount equal to the rate of dividend or dividends which shall have been before made and paid; and so on, from time to time, until a final dividend shall be declared and made," which is to be made when the funds shall be exhausted or the creditors provided for are satisfied.

And to enable the trustees the better to discharge the trusts, they are constituted attorneys, in fact, for the first party, &c. "And it is understood that this indenture, or any thing therein contained, is not in any manner to impair or affect the liabilities of the Bank nor the rights of the depositors or holders of the said notes and post notes."

The schedule attached gives a succinct but intelligible account and description of the estate in possession, real, personal, or mixed, assigned, where it is situated, from whom acquired, also of the choses in action, amount of debt, claim or demand, when due, from whom payable, and how secured, whether by personal security or mortgage, and the names of the personal sureties, and at what city or place the debt is payable, and whether evidenced or secured by bill or note, &c. &c. the whole estimated aggregate assigned amounting to the sum fo $12,473,800 60 cents, and the amount at Louisville to $216,063 64. And from the precise identity of the estate and debts attached, with the description given in the schedule, of the estate and debts at Louisville, it is obvious that the complainant must have inspected the deed of assignment and schedule, or a copy, before he filed his bill.

*The purport of the schedule and amount.*

*Amount at Louisville.*

The following facts, in substance, among others not necessary to be noticed were agreed by the counsel:

1st. "It is admitted that when the deed of trust was made, large amounts, to wit: many millions of notes of the Bank were outstanding, in the hands of the community, and circulating as money, and that large amounts were due for money deposited, and that large amounts of notes and deposits are still outstanding and unpaid."

BANK U. S. *et al.*
*vs*
HUTH.

2d. That said deed was duly executed and delivered, and the trust accepted on the day it bears date, and was recorded in the Recording Office, at Philadelphia, in due and legal time and manner, as prescribed by the laws of Pennsylvania and fully conformed in the formalities of its execution to the laws of said state.

3d. That the stockholders, at a called meeting before, united and recommended a deed of trust for the security of the circulation and deposits, and after the deed was made, at another meeting, approved by resolution what had been done.

4th. Pirtle and Speed were the attorneys of the Bank, also of the old Bank of the United States, and were retained generally in all their business, at Louisville, "and immediately after said deed was made, said trustees wrote to them to represent them as their attorneys in all matters growing out of said deed, and that they have ever since represented the trustees and made diligent efforts to collect the outstanding debts; and that the trustees have, ever since said deed was made, been diligently engaged in endeavoring to collect all the sums assigned to them under said deed; that they have been actively engaged in that part of the duties of the trust, &c. &c.

5th. That the Bank was embarrassed and had suspended specie payments when said deed was made, and was in a doubtful situation as to solvency; that no security for the complainants demand was requested or accepted by the holder, who is, however, embraced in the trusts of the assignment made by said Bank on the 4th September, 1841, which is exhibited; that the trustees have yet made no *pro rata* dividend under the deed, and do not know the holders of the notes; that they have, by force of a law of the State of Pennsylvania, taken, in payment of the debts assigned to them, large sums of the notes of said Bank, and continue to receive them; and that the trustees were not bank directors when the deed was made, nor had they any connection with the Bank, and were and are all gentlemen of high character, capacity, standing and responsibility.

Wm. Rawle, a counsellor at law, proves, in substance, that he was a director when said deed was made,

Evidence, &c.

and that its execution was prompted by no other than the honest motive of securing the claims provided for in the deed.   It is also proved by another witness, who was secretary to the board of trustees, that they have been diligently and faithfully engaged in the business of the trust, holding daily meetings, keeping regular minutes of their proceedings, and also all the usual books of account, and were conducting the business of the trust with honesty, fidelity, and an anxious desire to make the most of the property intrusted to them for the benefit of those interested; and being well acquainted with their business, as their secretary, from the beginning, he does not know of a single act of mismanagement or misapplication of the funds or property intrusted to them.

The counsel, waiving the preparation of the case, as to all the parties in detail, submitted it to the Court, upon the matters in contest between the complainant and the Bank and trustees, and the Chancellor sustained the complainant's bill, pronounced the deed fraudulent and inoperative against the complainant, and decreed the defendants to pay costs, reserving the case for further hearing as to other matters and parties; and the defendants have appealed to this Court.

Our statute of frauds and perjuries embraces, substantially, the principles of the statutes of the 13th and 27th Elizabeth, and the construction of those statutes furnishes lights to guide in the construction of ours.   It is now well established, by a train of decisions, both in the English and American courts, that a debtor may, in the absence of any existing lien, make a conveyance or assignment of the whole or a part of his estate for the benefit of all his creditors, or for the benefit of a part of his creditors, whom he may choose to prefer, provided the assignment is fair and not colorable, and made with the honest intention of doing equal justice to all, or of securing the payment of a just debt: *Hopkins* vs *Gray*, (7 *Mod.* 139;) *Eastwick* vs *Cailland*, (5 *Term Rep.* 402;) *Nevin* vs *Willsmore*, (8 *Term Rep.* 521;) *Meux* vs *Howell*, (4 *East*, 1;) *Small* vs *Oudly*, (2 *Pr. Wms.* 427;) *Cook* vs *Goodfellow*, (10 *Mod.* 489;) *Pharnex* vs *Assignee of Ingraham*, (5 *John. Rep.* 412–26–27; 3 *John.*

*Margin notes:*

BANK U. S. *et al.*
*vs*
HUTH.

The decree of the Court below.

The right of a debtor to prefer one creditor to another, by a deed or other security, to secure a just demand, is recognized in England under the statutes (13 and 27) of Elizabeth, and in this state under our statute, which substantially embraces the provisions of both those statutes.

Bank U. S. *et al.*
*vs*
Huth.

*Rep.* 84–5; 5 *John. Rep.* 344;) *Hendricks* vs *Robinson,* (2 *John. Chy. Rep.* 307; 4 *John. Chy. Rep.* ;) *Nichol* vs *Munford,* (*John. Chy. Rep.* 526–7–8;) *Wilt and oth-ers* vs *Franklin, assignee of Kerby,* (1 *Binney,* 502.)

The mere fact that the conveyance or assignment may have the effect to hinder, delay, and obstruct creditors, will not render it fraudulent. Every conveyance of any part of the debtors property may have that effect, in a greater or less degree, as it withdraws from the creditors' legal grasp the means *pro tanto* of coercing his debt. But to render it fraudulent, within the letter or the spirit of the statute, it must be "made and contrived of mal-ice, fraud, covin, collusion, or guile, to the *intent* or *pur-pose* to delay, hinder, or defraud." The statute was nev-er intended to restrict the debtor from paying or securing creditors whom moral duty and a sense of justice may dictate the propriety of paying or securing, or from doing equal and exact justice to all, by placing his means in a condition to that end. Such conveyance or assignment cannot be deemed to be made with the *fraudulent intent or purpose* to hinder or delay, but with the higher and nobler intent and purpose of paying or securing all equal-ly, or providing for those who are most meritorious. In the case of *Eastwick* vs *Cailland, supra,* Lord Kenyon said that it was neither illegal nor immoral to prefer one set of creditors to another. And in the case of *Meux* vs *Howell,* (4 *East,*) Lord Ellenborough said that it was not every feoffment, judgment, &c. that may have the effect of delaying or hindering creditors that is fraudulent within the statute 13*th Eliz.* This is the effect *pro tanto* of every assignment that could be made by one that has creditors. Every assignment of a man's property, how-ever good and honest the consideration, must diminish the fund out of which satisfaction is to be made to his creditors. But the feoffment must be devised of *mal-ice and fraud* to bring it within the statute.

The object of the statute was to prevent deeds, &c.

The object of the statute was to prevent deeds, fraudulent in their intention, and not such

fraudulent in their *inception* and *intention,* and not mere-ly such as in their effect might hinder or delay other cred-itors. It is the corrupt and covinous *motive,* the fraud-ulent *intention,* the *mala mens* with which the assign-

ment or conveyance is made that constitutes the fraud against which the denunciations of the statute are directed; and without the existence in fact, or presumed existence of an immoral or bad *intention or motive*, fraud cannot be perpetrated, either at common law or under the statute.

The motive or intention is to be arrived at from the facts and circumstances appearing in each particular case. And jurists, with a view to give full effect to the statute and to check and restrain the evil, have laid down certain badges of fraud, or evidences of bad *intention* in the act of conveyance, more or less conclusive according to their character or number. And as in moral propriety, a man should be just before he can be generous, they have determined that a gift or voluntary conveyance is fraudulent within the purview of the statute.

Assuming these principles to be settled, and waiving for the present, the objections raised against the form and terms of the deed, and taking a general view of the facts exhibited in this record, we are constrained to remark that we can perceive nothing in them that will lead the mind to a rational presumption, much less a rational conclusion, that the assignment in question was made or contrived of *malice, fraud, covin or guile*, with the *intent* or *purpose* of hindering, delaying, or defrauding creditors—nothing that is not reconcilable with the exercise of the undoubted right of providing for and securing a favored class of creditors. Indeed we can perceive nothing in the transaction that is not consistent with fairness, probity, and honor, on the part of those concerned; nothing that was not demanded by the claim of duty. Those provided for were undoubtedly a meritorious class of creditors. A large mass of society were concerned, and most likely the most ignorant and unsuspicious—the mechanic, the retired merchant and tradesman, the widow and the orphan, all confiding in the integrity of the Directors and the solvency of the Bank, had deposited their money in its vaults as a place of security. The vigilant trader or lynx eyed speculator, most likely, espying the storm at a distance, the approaching explosion of the Bank, had escaped from its wreck by withdrawing his

<div style="margin-note">

BANK U. S. *et al.*
*vs*
HUTH.

as, in their *effects might* hinder or delay creditors. It is the *corrupt* and *covinous* motive—the mind with which a deed is made or act done, that gives its character—without the existence or presumed existence of which, fraud is not imputed.

The intention & motive of a party making a conveyance, is to be ascertained by the facts and circumstances appearing in the case.

The opinion of the Court on the deed of trust in this case.

</div>

Bank U. S. *et al.*
*vs*
Huth.

funds or putting off the paper of the Bank; but the poorer class, confiding in the reputed integrity of the Directory and the stability of the Bank, and reposing in security on the general faith in the institution, had deposited their money in its vaults as a place of safety, without the hope of reward or the prospect or expectation of gain, or had received its paper as the safest and soundest medium of the country, and without inquiry or information, were resting in security when the explosion took place. As a guard and security to the very class of creditors provided for, the Legislature had not only required the prompt payment of their debts in specie, but had imposed high penalties and forfeitures for the failure. The Directors, by the general pressure of the times and embarrassment of the affairs of the Bank, having become unable to pay, would have been guilty, not only of a breach of faith and reposed confidence, but also of a breach of legal duty, in not providing security, to the extent of their means, for the satisfaction of the demands of this meritorious class of creditors. Encouraged by the previous resolution of the stockholders, they did provide that security by the assignment in question, which was approved by the subsequent resolution of a regular meeting of the shareholders; and in making the provision. conformed in substance, to that mode previously devised and provided by an act of the Legislature of the State of their residence and the location of their institution. Their bills had become widely circulated, not only through Pennsylvania, but through the whole Union, by reason of the confidence reposed in them. A large mass of the whole community had become the holders, and in many instances in such small parcels as forbade the idea of a resort to legal means of coercion, as the play would not be worth the candle. *Public duty* demanded that their claims should be secured. If fraud existed in the motive, intention, or act, it is chargeable upon the stockholders who connived at it, as well as upon the Directors and Trustees, who may be presumed to be men of character, and the latter of whom are proven to be such, and they have been guilty of connivance at, or

a participation in fraud, in doing an act which the claims of justice and of duty demanded.

The most commendable principle in a bankrupt law is that which secures to all equality in the administration of the assets of the bankrupt, and restrains any creditor, however overshadowing his debt or superior his diligence or his opportunities for its exercise, from seizing upon the effects of the bankrupt, and subjecting them to the payment of his entire debt, at any, no matter how much sacrifice. There being no bankrupt law, that voluntary disposition which the debtor may make of his property in securing the payment of his debts, which approaches nearest that equality, departing only so far from it as to secure that preference to favored creditors which may be dictated by a sense of moral duty, approaches nearest to the principles of equity and justice, for equality is equity. The Directors seem to have observed this rule, as well in the assignments as in the order of the assignments which they have made. They first provided for post notes in the hands of the Banks of the county and City of Philadelphia, who had provided their Bank, probably, with the means to sustain the payment of specie as long as they did, and which were advanced, most likely, upon the pledge of affording the security which was given, and which, amounting to over five millions of dollars, was secured by the assignment of the 1st of May, 1841. Secondly, they provided for the depositors and bill holders, whom they regarded as the next most meritorious class of creditors, and which they did by the deed in question, of the 7th of June following. And thirdly, they provided for all other creditors, by the deed of the 4th September following, and among them the complainant. This deed embraces all the remaining assets of the Bank, including the residuum, if any, of the effects assigned for the benefit of the two first classes, except some Railroad stock of little value, which was most probably retained by the Bank as the means of sustaining its corporate powers. Perfect equality is secured among the individuals or corporations of each class.

The complainant or the company to whom he belongs, and the debt which he represents, were placed in the

BANK U. S. *et al.*
*vs*
HUTH.

It is not a fraudulent preference by a Bank to se-

VOL. IV. • 55

Bank U. S. et al.
vs
Huth.

cure by deed of
trust, a depositer
of funds before a
lender of money
at interest.

third class, but perfect equality secured to him in that class. He or they are deserving creditors, but if any discrimination is to be made, they are less deserving than those of the first and second class, and less entitled to be secured, and so they were regarded by the Bank. They advanced their money to the Bank for the sake of gain, the accruing interest upon it; in the advancement they were placed in an antagonistical attitude of chaffering with the Bank, and had a right to demand an insight into its affairs, or security for the re-payment of the money loaned, and they have no right to complain that they were not placed in the same or in a more favorable class than those who trusted, without the sake of gain, relying upon the general credit of the Bank, and had no opportunity afforded them to ascertain its true condition.

More equality, equity, and justice will, most likely, accrue from the classification which has been made by the assignments, than if the affairs of the Bank had been left to the legal process of the Courts, and large creditors, like the complainant, had been permitted to seize upon its effects and subject them, at any sacrifice, to the payment of their entire debts, to the exclusion of other smaller and more remote or less vigilant, but equally if not more meritorious creditors.

With all the evidences of, and inducements to, the exercise of an honest purpose in the assignments which have been made, nothing less than the strongest and most satisfactory evidence of a fraudulent purpose and intention should induce the Court to yield to the conclusion that the deed in question had its origin in covin and contrivance, and was fraudulent and void. No such evidence is found in the facts of this record, unless they can be implied from the terms of the deed, or the form of its execution, to which many objections have been raised, some of which only we deem necessary to be noticed.

1st. It is objected strenuously, that the trustees, not being creditors, and the creditors provided for not being present nor consenting, the deed is voluntary, and therefore, fraudulent and void. In support of this objection, we are referred to the opinions of our predecessors, in the case of *Pitts' Trustees* vs *Viley*, (4 *Bibb*, 446,) and in

First objection
taken against the
validity of the
deed.

the case of *McKinley* vs *Combs*, (1 *Monroe*, 105.) In the first case the decision was not made to turn upon the point in question, but among other striking badges of fraud, the Court merely state as one, "that the creditors of Pitts were neither parties to the deed nor did they or any of them consent to its execution;" and say, "without deciding what would be the effect of either of those badges, taken separately, we can have no doubt, when united, that they are sufficient to justify the conclusion, that the deed is, in law, fraudulent, and therefore void." In the latter case the Court decided the principles embraced in the objection made by the counsel, and pronounced the deed merely voluntary, fraudulent and void, because it was made to strangers who were not creditors, deeming the consideration of five shillings, mentioned in the deed, as merely nominal. The Court refers to *Roberts on Fraudulent Conveyances*, 429-30, in support of the principle decided. Roberts does not assert the principle as a positive rule, but lays it down "as a proposition pretty clearly deducible from the general analogy of the reported decisions, and deducible from the very plan and spirit of the statute," and refers only to the case of *Leech* vs *Leech*, (*Chancery Cases*, 249,) decided by Lord Keeper Finch, (*Anno*. 27, *Car*. 2.) The principle asserted is not decided, but is sustained merely by the dictum of the Lord Keeper, as will appear by the quotation of Roberts, as well as by a reference to the case. *Turback* vs *Morbury*, (2 *Vern*. 510,) is also referred to in the margin as sustaining it. We have looked into that case and find that it does *not* decide the point contended for, but the fact was merely stated *cemente calamo*, among other numerous and decided badges of fraud, which of themselves authorized the decree. And in page 436 of the same treatise, we are referred to the case of *Langton* vs *Tracey*, (1 *Chy. Rep*. 33,) in which "a conveyance in trust to pay debts, though no creditor was party, nor any certainty as to persons appeared in the deed, nor any schedule annexed, was decreed good against a subsequent purchaser with notice of the trust. And the author, in conclusion, uses the following language: "Upon the whole, these are cases of such danger to purchasers, that

Bank U. S. *et al.*
*vs*
Huth.

a prudent adviser can hardly recommend a *title* which has been at all the subject of arrangements for the payment of debts remaining unsatisfied."

Numerous cases may be cited in which the objection to the deed existed, and was either passed over by the Court as unworthy to be noticed, or if noticed at all, was repudiated as untenable, or noticed in connection with other badges of fraud indicating secrecy, connivance, and concert between the debtor and trustee, to cover over the property from all creditors, for the benefit of the debtor, or to hinder and delay them in the collection of their debts: *Marbury* vs *Brooks*, (5 *Peters' C. R.* 354,) and the authorities referred to in the note appended; *Brooks* vs *Marbury*, (6 *Peters' C. R.* 223,) and the authorities cited in the note; *Wilt* vs *Franklin*, (1 *Binney's Rep.* 513,) and the authorities referred to; *Nichol* vs *Monford*, (4 *John. Chy. Rep.* 529,) and the authorities referred to; *Brown* vs *Minteem*, (2 *Gallison*, 557;) *Gill & John.* 205, 363.

The covenants of a trustee to perform the trust, is a good consideration to support the deed, though the trustee be not a creditor.

Indeed we can perceive no good reason or principle for requiring the trustee to be a creditor. The nominal consideration above is sufficient to support the use, and if it were not, the covenant or undertaking of the trustees to execute the trust is sufficient. The legal title passes by the execution and acceptance of the deed by the trustees. But they are invested with the legal title, not as donees or volunteers, holding the property for themselves, but holding it in trust for the use of creditors, the security of whose subsisting and unsatisfied debts form a sufficient consideration and inducement to the act, to free the conveyance from that imputation of fraud which would result from a naked gift. We cannot perceive any reason for a difference between a deed made to disinterested and competent trustees, for the use of the creditors, and one made to a creditor for the use of himself and other creditors. If there be any foundation for a difference, it is in favor of the one made to disinterested persons, as they would be most likely to do impartial justice in the administration of the assets among all the creditors, having no interest to swerve them from its observance.

2d. It is objected that the creditors were not present, nor have they assented to the trusts. They were widely dispersed throughout the United States, and were, to a great extent, unknown to the Directors, and could not be notified personally. The deed is manifestly for their benefit, and their assent and acceptance of its provision will be presumed—and *stabit presumptio donec probiter in contrarium*—the authorities before referred to.

The transaction was not veiled in secrecy. The deed was publicly made and spread upon the public records of the proper office, in the City where the Bank was located and the parties to the deed resided, and where all creditors provided for would have to go to receive payment of their demands, and where, upon the slightest inquiry, they must hear of the provision which was made. The case is entirely different from the case of *Moffett* vs *Ingham*, (7 *Dana*, 496-7.) In that case, from the secrecy of the transaction, the omission to give notice, and the entire want of knowledge on the part of the creditors, who were known, and their consequent failure to assent to the deed, fraud was presumed. The deed was adjudged a fraudulent contrivance between the debtor and trustee, to cover over the property and secure it from domestic creditors, while the debtor was permitted to retain the possession and enjoy the profits.

The answer of the trustees asserts that there were creditors claiming and asserting their rights under the deed, and they had no doubt others would claim and assert their rights. In the absence of all secrecy, contrivance, or fraud in the execution of the deed, the provision being obviously beneficial to the favored creditors, and their assent and acceptance consequently presumed, it lies upon the complainant, who seeks to subject the property to his demand, to repel the presumption by proof of abandonment or disclaimer on the part of the creditors provided for.

3d. It is objected that there is no schedule of the amounts, denomination, dates, or numbers of the bills and post notes provided for, or when payable, nor of the amounts of the deposits, and where made, and to whom payable; and it is contended it is a fatal objection to the

Bank U. S. *et al.*
vs
Huth.

Second objection taken to the deed.

Third objection to the deed.

BANK U. S. *et al.*
vs
HUTH.
deed. We cannot think so. The demands provided for are distinctly described, so as to be at any time ascertained and known, perhaps by a reference to the faces of the bills, notes, and certificate of deposits, and most certainly by a reference to the books of the Bank, which were at all times accessible, and if not so, might be made accessible by the order of a chancellor, or by a proceeding under the statute of Pennsylvania, before referred to. We cannot believe that, to render the deed valid, it was necessary to go into a detailed account of the size and denomination of the bills and notes, by letter, number, or date, or where payable, nor of the amounts of the several deposits. To do so, would have required the deed or annexed schedule to be protracted to an enormous length, without perceivable benefit, *lex non cogit inutilia.* Any one who required information could obtain it. The class of favored creditors provided for was distinctly described, and the amount of debt secured could be rendered certain by a reference to the Bank books, *id certum est redi certum potest.* Deeds have been sustained in numerous cases, containing much less certainty in the designation of the persons or debts secured, or property conveyed, than the one in question: 1 *Binney*, 502, *supra*; 4 *Mason*, 219; 6 *Mass. Rep.* 344; *Gill. & John.* 205, 363; *Langton* vs *Tracy*, (1 *Chy. Rep.* 33 ;) 2 *John. Chy. Rep.* 283, and the cases referred to; 4 *John. Chy. Rep.* 533, *supra*, and the cases referred to; *Cunningham* vs *Freeborn*, (1 *Edw. Chy. Rep.* 264;) *Hatch* vs *Smith*, (5 *Mass. Rep.* 42.)

Fourth objection
to the deed.
4th. It is objected that the creditors provided for, being unknown and numerous and widely dispersed, that an effort on the part of any one of them to reach the fund or render it subservient to the payment of his debt, would be interminable, and therefore the deed should be annulled. If this objection be sustainable it would prove that a few domestic creditors might be secured, but many could not. But under the statute alluded to, a mode is provided, by which any one interested may cite the trustees to a hearing, and we presume, without calling all the *cestui que trusts* before the court. And even in a court of equity, independant of the statute, where the

Bank U. S. *et al.*
                    *vs*
        Huth.

parties interested are so numerous as to render it imprac-
ticable to bring all before the court, we cannot doubt that
a chancellor might go on to hear the cause, dispensing
with the necessity of bringing all before the court, and
especially if a sufficient number were parties, to sustain
the controversy on each side.

5th. It is objected that the compensation allowed to the
trustees, and especially that allowed to the trustees by the
deed of the 4th September, is extravagant, and indicates
a fraudulent motive and intention in the execution of
both deeds, to provide salaries for favorites rather than to
provide a security for creditors. There is no evidence
that the compensation allowed was expensive, or more
than adequate for the services to be rendered. Nor is
there any evidence that their allowance, or the amount
was dictated by the motive suggested. And if the object
or motive were that suggested, as to the salaries allowed
by the deed of September, it could not, by relation, be
carried back about three months, so as to affect the deed
under consideration.

Fifth objection
to the deed.

In the latter deed, the commissions are not to exceed
one per cent upon the amount of collections and disburse-
ments, nor to exceed $2000 to each trustee in any one
year, which, for the sale and transfer and management of
property widely dispersed, and the collection and dis-
bursement of an amount estimated at upwards of twelve
millions of dollars, and a considerable portion of it at
distant and remote points, and involved, no doubt, in a
great degree, in perplexing embarrassment, cannot be
deemed an unreasonable or extravagant allowance for
men of probity and character, and capacity for the man-
agement of such complicated and extensive concerns,
such as the trustees are proven to be: *Hendrick* vs *Rob-
ins*, (2 *John. Chy. Rep.* 313.)

6th. It is objected that the provision in the deed which
requires the creditors provided for to bring forward and
prove their claims as a precedent condition to their right
to receive a *pro rata* dividend, is an evidence of bad
faith, and a disposition, on the part of the Bank, to em-
barrass the creditors, and to hinder and delay them in

Sixth objection
to the deed.

BANK U. S. *et al.*
vs
HUTH.

the collection of their rateable shares, such as should condemn the deed. We cannot think so. Indeed we cannot perceive any thing in the requisition that was not dictated by prudence and propriety, and the strictest regard for the interests of the Bank and the creditors provided for. Without the power to exact any proof as to the authenticity or genuineness of any of the claims offered for payment, they would have been exposed to frauds, impositions and forgeries, without the power to guard against them, unless the power should be implied, independant of the express provision. The character or amount of the proof is not specified, nor can we presume that more would be required than the possession and presentation of a *genuine* bill or post note, or certificate of deposit, with the amount, proven to be such by a competent judge, in some easy way, so as to enable the trustees, before hand, to make arrangements for the rateable distribution of the fund on hand, as contemplated by the deed. And if the trustees, in the establishment of a rule for the proof, should depart from propriety, or if they should establish and insist upon some unnecessarily rigid rule, calculated to embarrass and postpone the rightful claimants, they could and would be controlled by the court, under the statute of Pennsylvania, or by a court of equity.

The provision in the deed that debts against the Bank should be proved, was a necessary precaution and not an evidence of intent to hinder or delay creditors.

Though the amounts, dates, numbers, and titles of the bills and post notes, and certificates of deposit may be prescribed by the Bank, and may be easily known and distinguished, there may be counterfeits of the same amounts, dates, numbers and letters, and as bills and notes and certificates of deposits may be stolen or lost and found, and holden by persons not entitled to receive payment on them, and certificates of deposits may be assigned, and an assignment on them forged, there may be opposing claimants to the same amounts, and of course to enable the trustees to settle and determine, as well between the spurious and the genuine, as who is the rightful creditor and entitled to the dividend, there must be *some* proof. And as the means of determination, the trustees were rightfully invested with the power to exact *some* proof.

All bankrupt statutes require proof to be made of the demands set up and claimed, prior to and as a precedent condition to the right to claim a rateable dividend; and we cannot perceive the reason or grounds of imputing to a similar exaction, in a deed intended to secure rightful claimants, who are unknown, the purpose of fraud. To entitle himself to a dividend in each case, the party claiming must show that he has a genuine demand which can alone be shown by proof, varying in its character, nature and sufficiency, according to the nature and character of the demand set up.

7th. The action and omissions of the trustees, under the deed, are objected to as reasons strengthening the conclusion of fraud in the execution of the deed.

*7th. objection to the deed of trust.*

If the imputation against the trustees, implied in the objection, were admitted to be sustained by the record, we cannot admit that if the deed was good in its origin, their subsequent omissions, failures or negligence, can retroact upon it so as to render it bad; nor can their subsequent action, under the deed, furnish any just foundation for a presumption of bad faith in the Bank in its execution. If they are tardy or faithless in the administration of the assets committed to their charge, they may be compelled to do their duty by an appeal to the proper tribunal, by any one interested in the fund confided to their control, or removed, and other trustees substituted in their stead.

*If the deed was not fraudulent, the failure or negligence of the trustees, after its execution, could not make it so, or furnish any evidence of bad faith on the part of the Bank.*

Upon the whole, without noticing other objections raised against the deed, we are perfectly satisfied that it is valid in substance and in form, and that so far from finding any thing in the facts or circumstances exhibited in the record to justify the presumption of bad faith or contrivance for sinister purposes, in its execution, there are abundant and satisfactory reasons for the conclusion that it originated *in* an honest effort to set apart a portion of their funds, *in the general wreck of their* institution, for the benefit of a most deserving class of creditors.

*This Court's opinion of the deed—that it is valid.*

The conclusion to which we had arrived, as to the fairness and validity of the assignment, settles the controversy against the complainant.

*Where a bill is filed by a creditor, under the statute of 1838,*

BANK U. S. *et al.*
*vs*
HUTH.

to set aside a
conveyance, as
fraudulent,
whose debt is not
due, and the deed
is declared valid,
no decree can be
rendered in his
behalf.

For it may be observed that at the time when he filed his bill no part of his demand, principal or interest, had fallen due. He could only sustain his suit, therefore, by and under the authority of the statute of 1838. The second section of the statute provides that, "when any person shall sell or convey, or otherwise dispose of his, her or their lands, goods, wares, merchandize, choses in action, or other property, or shall suffer or permit the same to be sold, with the *fraudulent intent of cheating and defrauding* creditors, or of *hindering or delaying* them in the collection of their debts, the courts of chancery in this Commonwealth shall have power and jurisdiction in favor of any creditor, whether the debt *be* or *not due,* or *be* or *not in judgment,* to set aside the *fraudulent sale, conveyance,* or *other disposition,* and subject the property to the payment of the debt; and, for that purpose, to attach the property, and make all necessary or proper orders for the safety and forthcoming of the same."

The bare failure
to record a deed
of trust, fairly
made, does not
render it fraudu-
lent.

The complainant, failing to establish the *fraud* charged, has failed to manifest his right to maintain his suit under the statute. For we cannot admit that the bare omission or failure to record a deed, in Kentucky, honestly and fairly made, can constitute such fraud as will authorize a creditor, before his debt falls due, to attach the effects conveyed, and subject them to the payment of his debt. The omission or failure may happen through negligence, inadvertence, or other casualty, or the honest conviction that it might not be necessary to record it, without the slightest grounds for the imputation of fraud in its execution.

As a deed of mortgage or trust has no valid effect, under our statutes, against a creditor or purchaser until it is recorded, such construction of the statute of 1838 would authorize a creditor to intercept such deed, however honestly and fairly made, when on its way to the recording office, and before it reached its destination, by a bill attaching the effects conveyed, as a fraudulent disposition of them, to hinder and delay creditors.

It will be perceived, from the view we have taken of the record before us, that the questions mooted and argued in relation to our statutes and the rules of comity,

and the effect and operation which should be given to the
former, in case of a conflict between them, upon real es-
tate or personal property, situated in, or debts owing by
persons residing in Kentucky, need not be considered or
determined, yet it may not be deemed irrelevant or inap-
propriate to intimate our opinion upon some of these
questions.

In the general, personal property or debts owing, have
been adjudged to have no locality, but follow the person
of the owner or creditor, and are assignable, transferable
or transmissible by his voluntary act, according to the
laws of the country of his domicil. And this, as a gen-
eral rule, is regarded by all civilized nations, and it is
highly proper that it should be, otherwise the owner or
creditor, being ignorant of the laws of the country of
their *situs*, or of the residence of the debtor, might be
deluded and deceived in their honest efforts to dispose of
them, and innocent purchasers or assignees in their hon-
est efforts to acquire them.

In personal prop-
erty follows the
person of the
owner, and is
transferable by
the laws of the
domicil of the
owner.

But there are exceptions to this general rule. Every
state or nation possesses the power to pass laws for the pro-
tection and security of its own citizens, and being looked to
for the protection of property within its territorial limits,
has the unquestionable right to adopt such regulations for
its transfer, and the placing the transfer on record in the
state, as may be deemed necessary to protect and secure
its own citizens from impositions and frauds as purchas-
ers or creditors. And if such regulations be adopted
which conflict with the foregoing general rule, the former
will prevail: *Story's Conflict of Laws, from* 311 *to* 316,
*and from* 320 *to* 334, and the authorities referred to.

But each state
or government
has the right to
prescribe the ev-
idences by which
such transfers
shall be preserv-
ed for the secu-
rity of creditors
or purchasers.

But a construction should not be hastily given which
would lead to a conflict, if an interpretation can be fairly
made to avoid it: or, in other words, there should be a
clear and manifest repugnance between them to justify
the courts to disregard the foregoing general rule, which
is respected and regarded by all civilized nations, upon
the principles of comity.

Such construc-
tion should be
given the regis-
try acts of differ-
ent states as to
prevent conflict
if practicable.

The peace and harmony among states and nations, and
the mutual protection, security and safety of the rights of
the citizens of each, demand that this great law of na-

BANK U. S. *et al.*
*vs*
HUTH.

tions should not, upon slight grounds, be impaired or disregarded.

The question occurs whether, in the interpretation of our statutes, observing the rule untrammeled, such irreconcilable repugnance be produced.

It is apparent, from the view we have already taken, that there is no irreconcilable contradiction between our statutes of frauds and the laws of Pennsylvania in relation to the execution of the deed of assignment. It is good here, and from the current of their decisions it would be declared good there. But we have several statutes requiring deeds of trust and mortgages to be recorded, and the question arises whether, and how far those statutes, in their application to real estate or to personal property, found in this state, and debts owing by persons living here, where the grantors of the deed of assignment and grantees all reside in Pennsylvania, conflict with the laws of the latter state; or whether, according to the rule of interpretation intimated, there is any positive regulation in relation to recording deeds of trust of such property here, which would invalidate the deed, as to purchasers and creditors, if not pursued.

*The statutes of Ky. as to recording deeds of trust and mortgages reviewed.*

All the statutes, prior to the act of 1820, in designating the county in which a deed of conveyance, whether in fee, in mortgage or in trust, shall be recorded, designate it as the county in which the land or property *lies,* and the statute of 1820, (1 *Stat. Law,* 449,) provides that no deed of mortgage or deed of trust, hereafter made or executed, for or upon any real or personal estate, shall be good or valid against any creditor, or a purchaser, for valuable consideration, without notice thereof, unless such deed shall, within sixty days after its execution, upon acknowledgment or proof, &c. be deposited for record the office of the county court clerk of the county where the *estate* therein conveyed, or the *greater part* thereof *lies.*

*The statute of 1837 required the recording of mortgages of equities, &c.*

And the statute of 1837, (3 *Stat. Law,* 143,) makes no change in the place of recording, but provides that, "after the 1st day of July, 1837, it shall be as necessary to record deeds of mortgage or trust, on equitable *titles,* on real or personal property, as though the grantor had the legal estate, &c."

The statute of 1839, (3 *Stat. Law*, 144,) provides "that, from and after the passage of this act, no mortgage or deed of trust shall take effect, (except between the parties to the same,) until the same shall have been duly acknowledged or proven, and actually lodged with the proper clerk to be recorded."

These statutes certainly require deeds of trust or of mortgage for real estate, and perhaps of personalty, tho' made by residents or non-residents, to be recorded here. We say perhaps of personalty, for as to that description of property, according to the rule of interpretation which we have laid down, it may be a matter of some question if the parties reside in another state, though the *situs* of such property be here, as personal estate follows the person of its owner and is transferable, according to the laws of his domicil, whether, if it be conveyed by a deed of trust or mortgage, and duly recorded according to the laws of his domicil, the statute should be construed as applying to property thus conditioned.

The statute of 1796 requires agreements in consideration of marriage, where personal estate is settled, to be recorded "in the court of quarter sessions, or county court of that county in which such party shall *dwell:*" (1 *Stat. Law*, 439.) And the statute of frauds and perjuries requires a deed of gift of goods and chattels, where the possession remains not with the donee, to be recorded, (among other offices,) in the office of the quarter sessions or county court of the county wherein *one* of the *parties lives.*

These statutes certainly do not apply to deeds made by non-residents to non-residents, though the property or a portion of it may be situated in this State, unless there shall be a continued possession of the property for five years, within the State, in which case, under the last clause of the latter statute, where there may be a limitation, remainder, or reservation inconsistent with the apparent right, implied from the possession, such deed is declared to be fraudulent as to creditors or purchasers, if not recorded here. And it may be a question of some doubt, whether the statute of 1820 or other statutes requiring the record of deeds of trust or mortgages here,

**[margin notes:]**

BANK U. S. *et al.*
*vs*
HUTH.

By the statute of 1839, mortgages are invalid, (except between the parties,) except from the time they are acknowledged or proved and lodged with the clerk for record.

Deed of marriage settlement and gifts of goods and chattels to be recorded where one of the parties resides, by the act of '96 and statute of frauds, (1 *Stat. Law*, 439.)

*0*

Do the statutes of Ky. apply to conveyances by mortgage or deed of trust between citizens of other States, of property which, or a portion of which is in other States? *Qu.*

consistently with the high respect due to the rules of comity, should be construed to apply to conveyances in trust or mortgage, by the citizens and residents of other States, of such property, though situated here, in part or in whole, when such conveyance has been duly made and recorded according to the laws of their domicil; or whether those statutes, like others referred to, did not look to, and should not be confined in their application, to cases where the parties were residents and the property located here. The evil that existed was the separation of the right, by secret deeds of trust or mortgage, from the possession and apparent ownership, by which innocent purchasers or creditors were deluded, being induced to buy from or trust the apparent owner. This evil was intended to be remedied by requiring such deeds to be placed on the record of the county court of the county, which all persons might examine, as the means of guarding themselves against imposition, prior to closing the bargain of purchase or trusting the apparent owner. But the evil is certainly not so striking, nor the danger to be apprehended so great, when the owner or owners reside in another State, and their principal estate and business is there, and purchasers or creditors would, most likely, go there to buy or to trust, and recollecting the principle that personal property follows the person of the owner, and is transferable according to the laws of his domicil, would be impelled to examine the recording office there, for the information to guard themselves from imposition and fraud, rather than to the office of the county where a part of their property might be temporarily situated. There is no doubt that the duty to protect carries with it the power to regulate, and had the Legislature specifically required that a deed of trust or mortgage for all personal property situated here, should be recorded here, whenever or by whomsoever made, or whether its owner resided here or in any other State, such regulation would be valid and binding.

It must be presumed that the Legislature understood the rules of law and comity, in relation to the transfer of personal property, and that they understood the rule that *lex loci contractus,* among all civilized nations, was al-

lowed to govern the contract; and the question of doubt is, whether they intended, by the statute in question, and especially the statute of 1820, to prohibit the operation of those rules, so far as they applied to property here, though owned by and transferred to persons living in another State, or whether they did not look to and intend to provide only for cases where the owners as well as property were here. They certainly did not intend, in the statutes before referred to, of contracts or conveyances in consideration of marriage or of gifts, to operate upon non-residents or others than persons in this State, as the deed is required to be recorded in the county where the *grantor dwells*, or where *one of the parties lives*, yet the Legislature must have had in view the same policy in those statutes, the protection and security of creditors and purchasers, which they had in view in the enactment of the statute of 1820, and other statutes in relation to deeds of trust and mortgages. Though the statute of 1820 provides, in emphatic terms, that "no deed of mortgage or deed of trust hereafter made, &c., shall be good or valid, *&c.*" it is not lightly to be presumed that the Legislature looked beyond its own territorial limits, or intended to legislate for persons domiciled and resident in other States, in disregard of the well established principles of courtesy, though a portion of their personal estate might be here. Though the deed, by this statute, is directed to be recorded in the county where the estate therein conveyed or the greater part thereof *lies*, this may have been intended as the designation of a *place* for recording rather than as a description of the property intended to be embraced in the deed, or an intention on the part of the Legislature to apply its provisions to estate found here, though owned by persons in other States, and subject to their laws for the government of their persons and contracts. And as the ownership of personal estate carries with it the constructive possession, the permanent residence of the owner and mortgagor may have been intended, under the statute of 1820, to be the place where the property or the greater part thereof *lies*, and as the place for recording the deed, as was determined by this Court in the case of *Singleton* vs *Young's*

BANK U. S. *et al.*
*vs*
HUTH.

the statute of 1820, to operate on mortgages, &c. made by persons residing without the State, especially when the greater part of the property conveyed is without the State.—*Argu.*

BANK U. S. *et al.*
     *vs*
   HUTH. *executors,* (3 *Dana,* 559,) in the construction of the statutes preceding the statute of 1820.

Again, the *greater part* of the estate *conveyed* by the deed of assignment in question, does not *lie* in any county in Kentucky, but in the City of Philadelphia, so that the requisitions of the statute cannot be litterly complied with, unless it be construed to apply only, and be restricted to the *county* as the place of recording, in which the greater part of the estate in *Kentucky lies.* And even in that case, if the domicil of the owner be not regarded as the place where his personal property *lies,* as that description of property may, in fact, be temporarily situated in many counties, where a deed of mortgage or trust is made, it may often be a question of great difficulty and dependent upon the fleeting and uncertain recollection of witnesses, in what county the *greater part* of the property was situated when the deed was made.

But on the other hand, the statute is general and positive, and prescribes the county where the *estate* or the *greater part* thereof *lies,* as the place of recording, and may have been intended to designate the *situs* of the property, whether real or personal, as the place where the deed is to be recorded, and to require such record to be made in this State, whether the property belonged to citizens or residents of other States or nations. And this construction would certainly afford increased facilities for information to creditors and purchasers among our own citizens, and consequently enable them to guard themselves more readily against imposition and fraud, though it will subject non-residents, in many cases, to great hardships, and involve them, as well as our own citizens, in great doubt and uncertainty as to the proper county in which to record the deed, when the property is situated in several counties other than the one in which the owner resides, though he be a resident of the State, as may often happen.

But waiving the determination of this perplexing question, as we do not deem it necessary now to decide it, and indeed are not prepared to decide, we would remark that we are perfectly satisfied, from a minute examination of all our statutes, that *choses in action* or claims for

The statute of Ky. which requires the recording of mortgages, &c. of "real and personal estate"

debts were not looked to or intended by the Legislature, as the description of estate or property, the conveyance or assignment of which in trust or mortgage, is required to be recorded. The words *"real or personal estate,"* used in the statute, do not necessarily embrace *choses in action* or claims for debts, and are often used in common parlance to express estate or property in possession, in contradistinction to a right in action.

Bank U. S. *et al.*
*vs*
Huth.

do not necessarily embrace *choses in action* or claims for debts.

The statute of 1820, as well as prior statutes, designate the place for recording as the county in which "the estate or the greater part thereof *lies."* Real and personal estate in possession may have a *situs* or local position, and may *be* or *lie* in a certain place or county: but a *chose in action* or debt is not a *corpus*, capable of a *citus* or local position, but is purely *jus incorporale.* It cannot properly *lie* in any county. The statutes are, therefore, inapplicable to such property or interest, and cannot be understood to apply to or embrace it. Again, this Court, in the case of *The Bank of Kentucky* vs *Vance's administrator*, (4 *Litt. Rep.* 169,) and other subsequent cases, prior to the statute of 1837, decided that the statutes requiring deeds of trust, &c. to be recorded, were applicable to *legal titles* only, and did not apply to or embrace *equitable titles.* And the Legislature, by the statute of 1837, intending to remedy the evil, provides "that it shall be as necessary to record deeds of mortgage or of trust on equitable titles on real and personal property as though the grantor had the *legal estate."* Those judicial expositions of the legislative intention in former statutes, as well as the last recited act, indicate that they looked to and provided for the recording of conveyances of *titles* to specific property, legal or equitable, and not to a mere right to a debt, or a right to coerce payment of a sum, in money, which has no ear marks, or any distinguishable characteristic whereby it can be identified or known from any other sum of money.

Real or personal estate may have a *situs*, but a chose in action is not a *corpus* capable of a *situs* or local position.

The statute of 1837 cannot be understood as applying to a *chose in action* or legal right to a debt, but only to equitable titles in and to specific articles of property as the mortgagor's equity of redemption, or a bond for the

The statute of 1837, requiring mortgages, &c., of equitable interests to be recorded, does not

Bank U. S. *et al.*
*vs*
Huth.

apply to choses in action or legal rights to debts, but to equities of redemption or bonds for titles to definite parcels or real estate.

conveyance of a defined parcel of real estate or such like equities.

Again, the policy which dictated the statutes is not applicable to a *chose in action* or claim for a debt, as there is no such *visible* possession of such claims or separation of the right in them, from the apparent ownership, which is calculated to deceive creditors and purchasers; and indeed, for many years after the enactment of the early statutes, *choses in action* were not subject to the payment of debts, nor could be reached coercively and so applied by a creditor. It is true that the creditor has the possession of the evidence of the debt if the promise or undertaking be reduced to writing, if not, he has no visible possession of even that. But he has no visible possession of property or money which may be seen and looked to by the creditor for the payment of his debt, but of the right only to demand money, valuable or worthless, according to the condition of the debtor. He may assign such evidence of debt, absolutely conditionally, in trust or in mortgage, by an indorsement on the same, and such indorsements have never been deemed necessary to be recorded. To require them to be recorded, if they assumed the character of an assignment in trust or mortgage, would embarrass commerce by checking the negotiability and circulation of such paper.

The assignment of a debt is in equity an assignment of all securities for its payment.

As an assignment in trust or mortgage of such claim is not necessary to be recorded, so the assignment of a mortgage to secure them, though upon real estate, need not be recorded. Indeed a mortgage, to secure a debt, *is* the shadow, the debt the principal, and an assignment of the debt will carry with it the lien without other writing or act on the part of the assignor. The mortgage or lien cannot be separated from or assigned away, *without* an assignment of the debt.

The statute of 1839, for recording mortgages, &c. is introduced, and is a security to creditors and purchasers only, by ma-

The statute of 1839 was intended to effect no more than to remedy an evil that had grown up under the statute of 1820. The latter statute had provided that deeds of trust and of mortgage should be deposited for record in sixty days. If recorded within the time, the deed was construed to have relation back to, and full operation and

effect from its date. The consequence was that purchasers were deceived and cheated between its date and deposit for record. The statute of 1839 provided that it should have effect only from the date of its deposit. Tho' the statute seems to have been hastily and inartificially drafted, and in its literal import, in providing that such deed *shall not take effect, (except between the parties,)* until the same shall be acknowledged or proved. and deposited, we cannot believe that the Legislature intended, nor do we feel authorized to carry the provisions of the statute further than to afford increased security and protection to creditors and purchasers⁻ only by making the deed inoperative to them only, and not as to others, until it is deposited for record; and in this respect and to this extent only, to change the statute of 1820, which gave the deed operation and effect against them, from its *date,* if recorded within sixty days.

The policy of all the statutes looked to that single object and no other. We cannot believe that the Legislature·intended, by the provision that the deed *shall not take effect,* (except betwen the parties,) that they intended to give to the deed no effect in favor of *bona fide* mortgagors or *cestui que trusts* against subsequent *mere donees or fraudulent grantees,* who might, by trick or stratagem, have acquired a conveyance of the same property before the deed of mortgage or trust was deposited for record. And yet this would be the consequence of giving to the language of the statute its literal import, without looking to the prior statutes or the evil intended to be remedied.

We would further remark that it is obvious that the complainant in this case, before he filed his bill, or any lien attached in his favor, had *actual notice* of the assignment, in trust of all the property and claims which he is seeking to subject to the payment of his demand. And it has been determined by this Court that such actual notice, before any lien attached in his favor, will preclude a complainant from obtaining relief, in equity, against such property, though the deed conveying it has not been recorded, as required by the statute: *Morton* vs *Roberts,* (4 *Dana,* 258;) *Stewart & Co.* vs *Hall,* (3 *B. Mon.* 218;) *Bailey and Carter* vs *Welch,* (4 *B. Monroe,* 244.)

Bank U. S. *et al.*
*vs*
Huth.

king the same inoperative as to them, until deposited for record—and not to protect a subsequent grantee or incumbrancer, with notice of the deed.

Upon the whole, we are perfectly satisfied that the complainant is not entitled to the relief which he seeks. The decree of the Chancellor is, therefore, reversed and cause remanded that his bill may be dismissed.

*Pirtle* for plaintiffs : *Duncan and Browne* for def'ts.